# United States Court of Appeals
## For the First Circuit

No. 03-1949

DIANA VÁZQUEZ-VALENTÍN,

Plaintiff, Appellee,

v.

VICTOR J. SANTIAGO-DÍAZ, Individually and as Mayor of Toa Baja;
MUNICIPALITY OF TOA BAJA; MILAGROS DELGADO-ORTIZ,
Individually and as Human Resources Director of Toa Baja,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

Before

Torruella, Lynch, and Lipez, Circuit Judges.

Carlos A. Del Valle Cruz, with whom Anabelle Rodriguez, Secretary of Justice, and Ivonne Palerm Cruz, Deputy Secretary for Litigation were on brief, for appellants in their individual capacities.

Roberto Ariel Fernández for appellants in their official capacities and the Municipality of Toa Baja.

Guillermo A. Macari-Grillo, with whom Jesus M. Hernandez-Sanchez was on brief, for appellee.

September 22, 2004

**LIPEZ**, <u>Circuit Judge</u>. Diana Vázquez-Valentín ("Vázquez") brought an action against defendants -- the Municipality of Toa Baja; its Mayor, Victor J. Santiago-Díaz ("Santiago"); and its Director of Human Resources, Milagros Delgado-Ortiz ("Delgado") -- pursuant to 42 U.S.C. § 1983 for demoting and constructively discharging her because of her political affiliation. Following the jury verdict awarding compensatory and punitive damages to Vázquez, defendants seek the entry of judgment on their behalf as a matter of law or, in the alternative, a new trial. In arguing for judgment as a matter of law, defendants aver that plaintiff did not introduce sufficient evidence for a jury to reasonably infer that defendants discriminated against Vázquez on the basis of her political affiliation. Such an argument rarely prevails after a favorable jury verdict. However, having reviewed the record with care, we agree that it prevails here. Accordingly, we vacate the verdict and direct entry of judgment for defendants.

**I.**

Drawing on the evidence presented at trial, we begin by describing the background of this case. Except where noted, this background information is undisputed.

A. <u>The Change of Administration and Alteration of the Job Classification Plan</u>

On November 7, 2000, general elections were held in Puerto Rico. In the municipality of Toa Baja, defendant Victor J. Santiago, the PDP candidate for mayor of Toa Baja, defeated the

incumbent NPP candidate, Víctor Soto, who had been mayor for sixteen years.  In total, the NPP had controlled the municipal government of Toa Baja for twenty-four years prior to the 2000 election.

Upon taking office, the new administration apparently faced several challenges.  Among them were issues related to personnel actions and human resources plans that were detailed in several documents, including an audit from the Comptroller of Puerto Rico, dated June 14, 2000; a letter from the Commonwealth's Central Office for the Administration of Personnel and Human Resources (known by its acronym "OCALARH," which is based on the Spanish version of the office's name); and another letter from the Office of the Commissioner for Municipal Affairs (similarly known as "OCAP").[1]  These documents addressed personnel issues of the

---

[1]The contents of these documents were not admitted below, over defendants' strenuous objections.  The district court found that these documents were inadmissible as hearsay and informed the jury only that defendants sought advice about personnel actions and other issues, and that they received such advice from these agencies.  The exclusion of these documents as hearsay is troubling.  So crucial to the defendants' case, and offered as an explanation for the personnel actions undertaken by the defendants rather than for the truth of the personnel irregularities described in the documents, these documents are not hearsay, and they were highly relevant.  Their exclusion might well have justified a new trial.  However, we do not have to decide that issue because of our disposition of the case on sufficiency of the evidence grounds. Because defendants made an offer of proof regarding these documents at trial, we may consider the excluded documents as part of the record on appeal for the purpose of describing the background of this case. United States v. McDaniel, 482 F.2d 305, 311 (8th Cir. 1973); see also Wright and Graham, Federal Practice and Procedure: Evidence § 5040 (1977) ("Documents and other exhibits are usually

municipality.  In Puerto Rico, all municipal jobs are governed by so-called job classification plans that are adopted locally.  These plans set forth the occupational groups and personnel structure of the municipality, including the primary responsibilities and employment requirements for each position in city government.  The salaries for various jobs are set forth in a separate salary scale that establishes the salary for each job by classification.

From time to time, municipalities revise their job classification plans.  Toa Baja undertook this task in 1997, when it altered the then-existing job classification plan that had been adopted in 1991.[2]  According to the Comptroller's report, the 1997 changes were not valid alterations to the 1991 plan because they were not first submitted for approval to OCALARH, and past municipal administrations had appointed several hundred employees in violation of the relevant state law and regulations.  The report also recommended both that the municipality put in place a system for the selection and recruitment of personnel and that the

marked for identification and become part of the record on appeal, even if excluded.").  We do not consider these excluded documents in conducting our sufficiency of the evidence analysis.

[2]The parties bitterly dispute whether this alteration was in fact an altogether "new plan" of job classifications or simply an "amendment" to the existing 1991 job classification plan ("the 1991 plan").  The relevant ramifications of that distinction, as well as the approval process and the related municipal ordinances, are not germane to the sufficiency of the evidence claim, and we do not delve into them here.

administration develop a corrective action plan to remedy the various illegalities cited therein.[3]

Defendants then undertook a review of the personnel files of all 1,300 or so municipal employees. Defendants claim that they did so because, according to the Comptroller's report, "[n]ot addressing the recommendations of the audit . . . without just cause[] may constitute a violation [of] . . . the Government Ethics Act." Plaintiff maintains that the defendants sought to retaliate against members of the NPP. As of May 2002, at the time of the trial, around six hundred files had been evaluated, including

---

[3]On August 2, 2004, the same district court that heard this case issued an Opinion and Order and Partial Judgment in a related case, Maria Aldarondo Lugo v. Municipality of Toa Baja, Civil No. 02-1123 ("August 2 Opinion"). In Lugo, ninety-five employees and former employees of Toa Baja sued the city, Santiago, and Delgado, the latter two defendants in both their official and individual capacities, alleging politically discriminatory personnel actions. One group of plaintiffs alleged only political harassment. In the August 2 Opinion, the district court granted qualified immunity to Santiago and Delgado in their personal capacity, except with respect to the claim of the few plaintiffs alleging only political harassment. Relying on the documentary evidence excluded in Vázquez's trial but admitted in Lugo, the district court held that

> [d]efendants have shown with documentation and affidavits that they had legitimate reasons (i) to believe that the 1997 Changes were a new plan (including the view of governmental agencies) and (ii) for re-classifying Plaintiffs. Defendants have also shown that they did such re-classification in accordance with the law and at the instance of the Comptroller, a man appointed by the NPP former governor.

August 2 Opinion at 23.

-5-

Vázquez's.  Of those, 281 employees had sought an informal hearing regarding the personnel action that resulted from the review.

B.  Vázquez's Political Activity and Employment History

Vázquez has been active in the NPP since the age of eighteen.  She was president or chair of the NPP committee in her ward (Barrio Pajaros in Toa Baja), and she worked on the mobilization committee, organized rallies, and raised funds.  Additionally, she was one of the NPP's electoral college officers.

Her employment at the municipality of Toa Baja started in 1985, when Vázquez was employed in a transitory position[4] as an office clerk.  On February 1, 1989, she became a career employee in the position of Office Worker/Typist I at a monthly salary of $545.  On July 1, 1993, Vázquez was appointed to the position of Secretary III, with a monthly salary of $1019, at the request of David Córdova Torrech ("Córdova"), her immediate supervisor and head of the Office of Services to the Citizenry.  Twenty days later, Córdova asked that Vázquez be reassigned again, this time to the position of Assistant Director of the newly created Levittown branch of the Office of Services to the Citizenry.  That request was granted, and Vázquez assumed the position of Assistant Director on August 16, with a monthly salary of $1752.

---

[4]Government employees in Puerto Rico are classified as "transitory" or "temporary," which essentially means the employment is at-will, or as "career" or "permanent," which is the equivalent of having job tenure with attendant vested property rights.

In 1997, the alteration to the job classification plan eliminated the position of Assistant Director from the employment hierarchy.  In the wake of that elimination, Vázquez was reassigned to the position of Executive Director II.  Two years later, in 1999, Vázquez was appointed as an Administrative Assistant to Mayor Soto, a trust position within the administration.  Following NPP's defeat at the polls in 2000, Vázquez was reassigned to her former position of Executive Director II.

## C.  Vázquez's Demotion

On May 22, 2001, the defendants, Mayor Santiago and Director of Human Resources Delgado, held a meeting with fifteen to eighteen employees, including Vázquez, to notify them that their classifications were being changed pursuant to the decision to declare the 1997 plan null and void and return to the 1991 classifications.  According to Vázquez, Santiago explained at that meeting that the PDP had won the election and, in Vázquez's words, said that "they had to adopt actions with employees, that they had to clean house . . . ."  Santiago then explained that the affected employees had certain rights to administrative hearings and, again in Vázquez's words, "that whomever wished to go through attorneys, well, they then had to bear the consequences of their actions and that we would see each other in Court."  Vázquez testified that Delgado then took the floor, saying that she agreed with Santiago;

Delgado then explained the appeals process to the reclassified employees.

Following Delgado's explanation of the appeals process, the employees were handed letters describing their new classifications and explaining the reasons for the reclassifications. The letter to Vázquez stated that she lacked the academic preparation or experience for her current position and was being reassigned to Office Worker/Typist I, the position she held in 1989. According to the defendants' review of her personnel file, that was the last position to which Vázquez had validly been appointed.

Vázquez attended a hearing in front of an administrative hearing officer on September 9, 2001.[5] According to Vázquez, the hearing lasted approximately five minutes. In January 2002, the hearing officer issued a report and recommendation to the effect that Vázquez had been illegally hired and promoted. Although Vázquez remained in the Executive Director II position at the monthly salary of $2083 pending the outcome of the hearing, she was officially reassigned to Office Worker/Typist I by letter of January 30, 2002. Her monthly salary was reduced accordingly to

_____

[5]This hearing is apparently different than the hearing affected employees could seek before the Board of Appeals of the Personnel Administration System (which is known as "JASAP"). Vázquez was notified of her right to request an administrative hearing before JASAP to challenge the demotion, but she declined to seek such a hearing because, in her opinion, the "hearing would be futile and a sham and would violate [her] right to a due process."

$900, effective February 1. On March 15, 2002, Vázquez tendered her resignation to Santiago, effective April 9. Vázquez's employment history with the municipality is summarized below, with appointment date or year, job title, and monthly salary where known.

- 1985: Office clerk

- February 1, 1989: Office Worker/Typist I ($545 monthly salary)

- July 1, 1993: Secretary III ($1019 monthly salary)

- August 16, 1993: Assistant Director ($1752 monthly salary)

- 1997: Executive Director II (change of title because of changes in the 1997 plan)

- May 1, 1999: Administrative Assistant (trust position)

- January 10, 2001: Executive Director II ($2083 monthly salary)

- February 1, 2002: Office Worker/Typist I ($900 monthly salary)

- April 9, 2002: resignation effective

D. <u>The Lawsuit</u>

Vázquez brought this civil rights action pursuant to 42 U.S.C. § 1983 on June 13, 2001, against the municipality of Toa Baja, Mayor Santiago, and Human Resources Director Delgado. Vázquez sued Santiago and Delgado in both their official and personal capacities. Vázquez alleged that she was demoted and constructively discharged, and that these adverse employment

actions violated her First Amendment and due process rights under the United States Constitution. In her complaint, she sought compensatory and punitive damages, as well as reinstatement. The defendants denied the allegations and replied that Vázquez was illegally appointed to her position with the city and that they were obligated to correct the irregularity.

On March 27, 2002, prior to trial, the defendants moved for summary judgment, with Santiago and Delgado raising the affirmative defense of qualified immunity in their individual capacities. The district court denied the motion. A jury trial began on April 30, 2002. At the close of all evidence, defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50, arguing that Vázquez did not produce sufficient evidence to show (1) that her due process rights were violated, (2) that her political affiliation was a substantial or motivating factor for her demotion, or (3) that she was constructively discharged. The district court granted defendants' Rule 50 motion as to the due process claim but denied it in all other respects, including the qualified immunity defense.[6]

On May 14, the jury found for plaintiff, awarding her $275,000 in compensatory damages for mental and emotional pain and suffering, $6,828 in compensatory damages for lost earnings, and

---

[6]Vázquez does not appeal the district court's ruling on her due process claim.

$42,000 in punitive damages, for a total of $323,828, plus post-judgment interest, reasonable costs, and attorney's fees.[7]  In light of the jury finding that the defendants discriminated against Vázquez on the basis of her political affiliation and the jury's award of punitive damages, the district court rejected Santiago's and Delgado's affirmative defense of qualified immunity. The district court then denied defendants' post-trial Rule 59 motion, which asked the court to set aside the compensatory and punitive damages as excessive and without a sound evidentiary basis.  The district court also ordered the defendants to reinstate Vázquez to her previous position of Executive Director II.

The defendants raise several arguments on appeal. First, they urge that the district court erred in denying their Rule 50 motion as to the political discrimination claim.[8]  Second,

---

[7]The pain and suffering damages were apportioned among the defendants as follows: $178,750 from the municipality; $68,750 from Santiago; and $27,500 from Delgado.  The lost earnings award was assessed jointly and severally against all defendants, and the punitive damages were assessed $30,000 to Santiago and $12,000 to Delgado.

[8]Although defendants made a motion pursuant to Rule 50(a) before the case was submitted to the jury, they failed to renew that motion after the jury verdict.  Ordinarily, that omission would mean that a party could not seek judgment as a matter of law on appeal.  See Udemba v. Nicoli, 237 F.3d 8, 13 (1st Cir. 2001) ("[T]o preserve for appeal the district court's rejection of a motion for judgment as a matter of law made at the close of the evidence, the movant must seasonably renew that motion post-verdict").  However, "even when a party has failed to make the proper motion below, this court retains the authority to 'inquire whether the record reflects an absolute dearth of evidentiary support for the jury's verdict.'"  Id. (quoting Faigin v. Kelly,

-11-

defendants argue that the district court erred in denying admissibility of the Comptroller's report and agency letters, which defendants maintain were crucial to substantiating that political discrimination was not a factor in Vázquez's reassignment. Third, defendants claim that the trial court made allegedly prejudicial remarks in front of the jury. Fourth, defendants assert that the district court erred in ordering plaintiff reinstated to her previous position of Executive Director II. Finally, in their individual capacity, defendants challenge the district court's denial of the qualified immunity defense. Because of our disposition of the sufficiency of the evidence claim, we do not reach defendants' other arguments.

**II**.

A.  <u>Standard of Review</u>

The standard for setting aside a jury verdict pursuant to Federal Rule of Civil Procedure 50(b) is a stringent one: "[W]e must examine the evidence in the light most favorable to the plaintiff and determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion -- that there is a total failure of evidence to prove plaintiff's case." <u>Mayo</u> v. <u>Schooner Capital Corp.</u>, 825 F.2d 566, 568 (1st Cir.

---

184 F.3d 67, 76 (1st Cir. 1999)).  We invoke our authority to assess the sufficiency of the evidence here.  We also note that plaintiff has failed to allege defendants' forfeiture of the sufficiency of the evidence issue.

1987) (quotation and citation omitted). In reviewing the record, we will evaluate neither the credibility of the witnesses nor the weight of the evidence. Santiago-Negron v. Castro-Davila, 865 F.2d 431, 445 (1st Cir. 1989). Even though we draw all rational inferences from the facts in favor of plaintiff, "the plaintiff is not entitled to inferences based on speculation and conjecture." Ferrer v. Zayas, 914 F.2d 309, 311 (1st Cir. 1990). A non-moving party who bears the burden of proof, as Vázquez does here, must have presented "more than a mere scintilla of evidence in its favor" to withstand a motion for judgment as a matter of law. Invest Almaz v. Temple-Inland Forest Prod. Corp., 243 F.3d 57, 76 (1st Cir. 2001) (quotation and citation omitted). Additionally, we are not obligated to disregard uncontradicted evidence offered by defendants. Santiago-Negron, 865 F.2d at 445.

B.  Analysis of Political Discrimination Claims

A governmental employee who is not in a policy-making position of confidence and trust is shielded from adverse employment decisions because of the employee's political affiliation. Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 7 (1st Cir. 2000) (citing Branti v. Finkel, 445 U.S. 507, 517-19 (1980), and Rutan v. Republican Party of Illinois, 497 U.S. 62, 75 (1990)).[9]  When a plaintiff brings a political discrimination

_____

[9]Although Vázquez held a trust position in the previous administration from May 1, 1999, to January 10, 2001, her removal from that position and restoration to Executive Director II are not

-13-

claim, she bears the burden of "producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that plaintiff['s] constitutionally protected conduct -- in this case, political affiliation with the NPP -- was a 'substantial' or 'motivating' factor behind [her] dismissal." Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993); see also Figueroa-Serrano, 221 F.3d at 7 (citing Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)) ("To prevail on a free speech claim, a public employee must show that she engaged in constitutionally-protected conduct and that this conduct was a substantial factor in the adverse employment decision."). The plaintiff bears the burden of persuasion on these issues throughout the case.

The defendant, of course, may offer rebuttal evidence to attempt to disprove that political affiliation played a substantial role in the adverse employment action. Additionally, even if the plaintiff establishes that proposition by a preponderance of the evidence, the defendant may raise an affirmative defense: it may attempt to "prove by a preponderance of the evidence that plaintiff[] would have been dismissed regardless of [her] political affiliation." Acevedo-Diaz, 1 F.3d at 66; see also Mt. Healthy, 429 U.S. at 287; Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 124 (1st Cir. 2004). In other words, even if the plaintiff has shown that her political affiliation was a substantial or motivating

_____

at issue here.

factor in the adverse employment decision, the defendant will not be held liable if it can persuade the factfinder that it would have taken the same course of action anyway, without regard to plaintiff's political affiliation. The Supreme Court has made clear that defendant's Mt. Healthy defense serves to prevent an employee who would have received an adverse employment decision based on legitimate reasons from being "in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." Mt. Healthy, 429 U.S. at 285. However, if a plaintiff does not produce evidence sufficient to allow a reasonable inference that political discrimination was a substantial or motivating factor in the challenged employment action, we need not analyze defendant's Mt. Healthy defense. Accordingly, we turn now to evaluating whether plaintiff produced sufficient evidence for a reasonable jury to find that her political affiliation was a substantial or motivating cause of her demotion and alleged constructive discharge.

C. The Evidence Adduced at Trial

We will reverse a jury verdict in a case such as this "only if: (1) the record evidence compelled the conclusion that the plaintiff would have been dismissed in any event for nondiscriminatory reasons [in other words, the Mt. Healthy defense prevails as a matter of law], or (2) the plaintiff did not introduce sufficient evidence in the first instance to shift the

burden of persuasion to the defendants." Acevedo-Diaz, 1 F.3d at 67. Here, we are presented with the rare case that requires reversing a jury verdict on appeal because plaintiff's evidence failed to establish that political discrimination was a substantial or motivating factor in the challenged employment action. Because the court's dismissal of the due process claim was not appealed, we include in our analysis only testimony relevant to the First Amendment claim.

### 1. Plaintiff's Witnesses

Plaintiff offered testimony from four witnesses: (1) María Sánchez Coraliza ("Sánchez"), Assistant Director of the Human Resources Office and author of both the 1991 and 1997 job classification plans; (2) David Córdova Torrech ("Córdova"), now retired after fourteen years of municipal service that included serving as director of the Citizen's Office for the Mayor and as Vázquez's direct supervisor; (3) Linda E. Rivera Vega ("Rivera"), who was purchasing and procurement bids director for the municipality during six months relevant to this litigation; and (4) Vázquez herself.

### a. Sánchez

Sánchez testified that when she became aware that Santiago was considering rescinding the 1997 plan and restoring staffing in accordance with the 1991 plan, she told him "that I did not believe that he should take upon himself to do the action that

he intended to do . . . since there were explanations for everything that had taken place and that could entail certain employees might sue him and that he might have to appear in court." According to Sánchez, Santiago replied that "if he had to go to court and the court assigned him to pay, that he would pay." Sánchez further testified that she advised him that "the 1997 plan had been approved by a municipality ordinance and that he should seek guidance in that sense."

In answer to questions about how many employees were switched from career employee status to transitory employee status as a result of the Mayor's decision to rescind the 1997 plan, Sánchez could not give a numerical estimate. Instead, she mentioned some names of affected people whom she personally knew. After listing five people by name and saying that she "would have to mention a whole bunch of them because there were many," Sánchez testified that "all these people" belonged to the NPP.

Plaintiff also elicited testimony from Sánchez regarding Vázquez's qualifications for the positions to which she had been appointed. In sum, Sánchez testified that Vázquez was qualified for all the positions she had held at the municipality. However, Sánchez admitted on cross-examination that Commonwealth law requires, with some exceptions, that before a position is filled it must be posted or advertised; that the vacancy must be filled using a system called the "register of eligible" or some alternative

equivalent system; that the hired personnel must serve a probationary period of three to six months; and that an employee may only become a career employee after satisfactorily completing the probationary period.  Sánchez also testified on cross that the municipality had not followed these hiring procedures as a general matter.

### b.  <u>Córdova</u>

Córdova, director of the Citizen's Office for the Mayor and Vázquez's direct supervisor, testified to Vázquez's increasing responsibilities and growth as an employee during her tenure with him.  During Vázquez's thirteen years under Córdova, he made two written evaluations of her job performance.  Additionally, Córdova explained that he petitioned the former mayor to appoint Vázquez as Assistant Director of a branch of the Citizen's Office.  For purposes of our appellate review, we will assume that Córdova's testimony regarding Vázquez's job responsibilities established that she met the minimum stated requirements for the positions of Secretary III and Assistant Director (a position that was essentially renamed Executive Director II in 1997).

### c.  <u>Rivera</u>

Rivera, a member of the PDP, testified that she told Delgado "that I am a person who under no circumstances will persecute anyone because as she [Delgado] knows, I have been persecuted for more than seventeen years by the NPPers and the

Populares [PDP party members] who have allowed that I be persecuted and that I would under no circumstances would [sic] allow that and if I saw anything or understood that there would be any persecution, that I would rather resign and that is what I did."

Rivera also testified about her understanding and observations of political persecution during her time at the municipality. She explained her "understanding that persecution involves leaving an employee without work," and when Rivera passed Vázquez's desk, she often observed that Vázquez had no work to do. Rivera made the same observation about one other employee. In consequence, Rivera told the municipal secretary, Dora Martinez Torres ("Martinez"),[10] to "'watch out,' because since she belongs to another party, and was not giving them any work it could be understood that it was political persecution." Rivera said that Martinez was a member of the PDP and that she began work after the new administration took office. Additionally, she explained that while at first she did not have an adverse relationship with Martinez, their working relationship later soured because of Martinez's "persecution with the employees."

According to Rivera, she used to have lunch with Martinez and Delgado, but "upon seeing that they thought differently than the way I thought, well, then I understood that it was best not to have lunch to avoid taking any decisions, well, leave my job, be a

_____

[10]Martinez is not a party in this case.

part of a persecution, and remarks that might be out of order." When pressed as to what <u>Delgado</u> specifically said that convinced Rivera that they should no longer lunch together, Rivera said that "[o]ne of Mrs. Delgado's remarks had to do with the process when letters were to be delivered that there would be equality -- let's say that the salaries were going to be lowered or if their permanency was going to be removed, well, then it would be the same for everyone notwithstanding the person involved."[11] Later, Rivera testified that she and Delgado had lunch together perhaps two or three times and that they did not talk about politics.

Rivera was asked whether she "could tell the jury if the members of the New Progressive Party employees were targeted for this personnel action" of receiving the reassignment letters. Rivera replied: "Yes, because the employees who were given permanence in '97, well, those were the employees who would be subjected to the application of the law in which their permanence would be taken away from them." Upon prompting, Rivera said that those employees belonged to the NPP party.

d. <u>Vázquez</u>

Vázquez was on the stand for three days. In addition to detailing her work history and the responsibilities of her

[11]Plaintiff's counsel asked whether the translation might be more accurate as "regardless of the <u>pressure</u> involved" instead of "regardless of the <u>person</u> involved." The court replied that it "had no objection to that."

employment with the municipality, Vázquez testified that her academic preparation and experiences qualified her for all of the municipal positions that she had held. Vázquez also testified that her immediate supervisor, Martinez, both made politically discriminatory remarks, including stating that "[w]ell, hopefully they will kill all the NPPers" and failed to give her any work from January to August of 2001. On August 24, 2001, Vázquez sent a letter and an accompanying table to Martinez detailing her work assignments since January 15, 2001 (excluding one month of vacation and one month of sick leave over the seven-month period). The letter informed Martinez that of the remaining five months of that period, Vázquez performed tasks on forty-two of the 106 work days. On cross-examination, Vázquez admitted that she never informed Delgado or Santiago of her lack of work, saying that it is "not the mechanism, and that would be gossip." She further admitted that after Martinez received her letter of August 24, Vázquez was given sufficient work to occupy her work days.

Vázquez testified about the meeting on May 22 when between fifteen and eighteen employees were given their reassignment letters. She said that all of the employees at the meeting were members of the NPP who "held positions of hierarchy in the previous administration." According to Vázquez, "the Mayor began the meeting indicating that he was the person in power, that the Popular Democratic Party had won. That they had to adopt

-21-

actions with employees, that they had to clean house and that they were going to deliver letters to us in which there would be changes in our salaries or our permanence; that whomever wished to go to JASAP had 30 days to do so, that whomever wished to go through attorneys, well, they then had to bear the consequences of their actions and that we would see each other in Court."[12] Vázquez continued recounting the events of the meeting, noting that Delgado "began indicating that she was seconding what the Mayor had stated and she explained the appeals process."

Vázquez also recounted the details of what appears to be the only other time she met Santiago. When Santiago was campaigning and seeking votes, he visited the community where Vázquez lived. According to Vázquez, "[h]e came up the stairs. At that point he introduced himself as a candidate for the Popular Democratic Party and at that point I told him that I belonged to the New Progressive Party, that I campaigned for the NPP from 1984. That I was a militant and that I had held assorted positions with the administration of Mayor Victor Soto and as all candidates he told me that he was counting on my vote." Plaintiff's counsel then asked Vázquez whether Santiago "was able to recognize you that you

---

[12]Santiago disputes that he said that they were going to "clean house." Instead, Santiago testified that at the May 22 meeting, he said that "it is my obligation [to] correct what the previous administration did wrong and that . . . very much in spite of what I might want to do, I had to do it morally." Of course, under the Rule 50 standard, we credit Vázquez's version of events over Santiago's for purposes of our analysis here.

were a member of the New Progressive Party" at the May 22 meeting. Vázquez responded, "He shook hands with me and greeted me."

Vázquez also testified about her activity on behalf of the NPP. She had been an electoral college officer since the age of eighteen and president of the committee for her local ward in Toa Baja. Vázquez participated in mobilization, fundraising, organizing, and "all kinds of activities related to politics and the NPP."

### 2. Defendants' Uncontradicted Testimony

Before considering this testimony, we observe that a strong case could be made that defendants' motion for judgment as a matter of law at the close of plaintiff's case should have been granted. Of course, defendants do not make this argument on appeal. Having put on a defense at trial, they are foreclosed from doing so. See Gillentine v. McKeand, 426 F.2d 717, 723 (1st Cir. 1970) ("defendant's motion for a directed verdict at the close of plaintiff's case expired" upon the introduction of substantial defense evidence and was not preserved for appeal). Accordingly, in evaluating defendants' appeal from the district court's denial of their motion for judgment as a matter of law after the close of all evidence, we consider both plaintiff's evidence and the uncontroverted evidence offered by defendants. Santiago-Negron, 865 F.2d at 445.

### a. Delgado

-23-

Delgado testified that at the time of transition between the two administrations, the municipality had 1,343 employees on its roster. Delgado's uncontradicted testimony also established that there was no evidence in Vázquez's personnel file establishing that Vázquez met the minimum requirements for appointment to Secretary III or Assistant Director, or that she served the requisite probationary period for either position.[13] Delgado testified that according to the documents in Vázquez's personnel file, Vázquez lacked the commercial or secretarial training required to be appointed to Secretary III in 1993. On cross, plaintiff's counsel drew Delgado's attention to Córdova's letter asking that Vázquez be appointed to Secretary III, which, taking the evidence in the light most favorable to the plaintiff, could establish her eligibility for the position. Upon questioning, Delgado testified that she cannot explain why that document was not contained in Vázquez's personnel file.

Delgado further testified that Vázquez's personnel file contained no indication that the Human Resources Department followed the procedures and analysis required to reclassify an employee, without competition for the position, based on the

---

[13]We do not make this point to question Vazquez's qualifications for her positions. As noted in our discussion of Córdova's testimony, we have assumed that she met the stated qualifications for the positions of Secretary III and Assistant Director. We simply make the point here that anyone reviewing her personnel file would not find evidence of these qualifications in the file.

employee's assumption of greater responsibility and obtaining further credentials.

b. <u>Santiago</u>

In uncontradicted testimony from Santiago, he explained that he sought advice regarding the effect and legality of the 1997 plan, and that he acted on that advice. As noted, the evidentiary rulings below prevented the defense from putting before the jury the nature of the advice the defendants received.

Santiago further testified that of the municipal employees who received letters adjusting their status, "nearly half of them, their salaries have increased, others have gone down." He also testified that he retained several members of the opposing party in trust positions after he took office and that he took only one of his people into the mayor's office with him. According to Santiago, "the rest of them, I honored their position and I allowed them to remain, despite the fact that it's a high confidentiality position . . . ."

Santiago was asked on cross-examination whether he knew the party of the employees who lost permanent status and became transitory employees by virtue of declaring the 1997 plan void. He replied that "[t]here are members of all three parties." When pressed for an estimated percentage break-down among the parties, Santiago could not provide one, but he agreed that there were more NPP members than PDP members in that group. When counsel asked

whether it is "a true fact that, more or less, from 75 to 80 percent of the employees of Tao Baja are members of the New Progressive Party," Santiago agreed that "[t]hat might be." According to Santiago's uncontradicted testimony, he had not appointed anyone to a career position since he took office.

D. <u>Topical Summary of the Evidence</u>

On topics important to establishing a political discrimination claim, the evidence that we have reviewed through the Rule 50 lens establishes the following propositions.

1. <u>Personnel Actions</u>

Defendants rescinded the 1997 plan and reassigned several hundred employees, including Vázquez, in accordance with the 1991 plan. Sánchez testified that she advised Santiago to seek advice before deciding to rescind the 1997 plan. Santiago's uncontradicted testimony was that he did indeed seek such advice. As we have described, the nature of that advice was kept from the jury at trial.

Sánchez testified that the people whom she knew who were affected by the reclassification plan were NPP members. Rivera also testified that affected employees belonged to the NPP. However, the kind of personnel review undertaken by defendants necessarily would impact more NPP members because of the long dominance of the NPP over municipal affairs. Indeed, Santiago agreed with plaintiff's counsel that approximately seventy-five to

eighty percent of the employees of Toa Baja are members of the NPP, and Rivera herself explained, "because the employees who were given permanence in '97 [when the NPP had been in control of the city government for over twenty years], well, those were the employees who would be subjected to the application of the law in which their permanence would be taken away from them."

Santiago's uncontradicted testimony was that nearly half of the employees affected by the personnel changes actually received higher salaries. Plaintiff neither rebutted this testimony nor offered any evidence that there was a disparity -- by political affiliation or otherwise -- between those who received higher salaries and those who received lower salaries under the new reclassifications.[14]

## 2. Treatment of Vázquez

Vázquez lacked sufficient work to occupy her time from January through August 2001 (less the two months when she was on leave). When Vázquez sent a letter to her immediate supervisor, Martinez, detailing her lack of work projects during this time, Martinez began assigning Vázquez adequate work. Additionally, Vázquez was demoted from Executive Director II to Office

---

[14]As we recently explained in Sanchez-Lopez, while "there is simply not a claim of 'disparate impact' available under this First Amendment doctrine" of political retaliation, evidence that "all of the employees affected by defendants' actions were NPP members" might be considered evidence that defendants harbored discriminatory animus. Sanchez-Lopez, 375 F.3d at 140.

Worker/Typist I effective February 1, 2002. A hearing officer found that the reassignment was valid because Vázquez previously had been illegally hired and promoted.

Sánchez and Córdova testified that Vázquez met the minimum qualifications for each of the positions to which she had been appointed. However, Sánchez admitted that the municipality generally did not follow the procedural requirements for personnel actions. Plaintiff never offered any clear evidence or testimony that her appointments either met these procedural requirements or were eligible for an exception to any of the requirements. In fact, Vázquez admitted that she was promoted without going through the regular competitive process or serving the normally required probationary period. Furthermore, Delgado's uncontradicted testimony was that there was no material in Vázquez's personnel file to show either that the procedural requirements were followed or that Vázquez's appointments were eligible for an exception to the usual procedural requirements.

Taking the evidence in the light most favorable to the plaintiff, Vázquez arguably established that she did not need to comply with the normal appointment procedures when she assumed the position of Executive Director II because that position was simply a reclassification of the position of Assistant Director. However, Vázquez's demotion to Office Worker/Typist I was premised on the alleged illegality of her appointment to Secretary III, not on any

ineligibility to be reassigned from Assistant Director to Executive Director II.

### 3.  Statements of Discriminatory Intent

At the May 22 meeting, where fifteen to eighteen NPP employees received letters adjusting their positions within the municipality, the Mayor stated that the "Popular Democratic Party had won.  That they had to adopt actions with employees, that they had to clean house and that they were going to deliver letters to us in which there would be changes in our salaries or our permanence . . . ."[15]  Plaintiff presented evidence of one other statement evincing discriminatory intent or animus:  Martinez, plaintiff's direct supervisor and a non-party in this case, said at a gathering something like "[w]ell, hopefully they will kill all the NPPers."

### 4.  Rivera's Perception of Political Retaliation

Rivera, a member of the PDP, offered what is best characterized as lay opinion testimony: she thought political retaliation was occurring in her department under Martinez, based on her observation that Vázquez and one other employee were not fully occupied with work, at least for some period of time. Rivera testified that "if I saw anything or understood that there would be any persecution, that I would rather resign and that is what I

---

[15]Again, we note that although this evidence is contradicted by Santiago's testimony, we take it as true for purposes of the Rule 50 analysis.

did." Additionally, Rivera said at one point that after having lunch with Delgado and Martinez, she saw "that they thought differently than the way I thought." There is also an ambiguous reference to "remarks that might be out of order" in Rivera's testimony. Rivera also testified that her relationship with Martinez soured over Rivera's perception of political persecution in the workplace.

However, Rivera also testified that she and Delgado did not talk about politics, and that the only political comment Delgado made to her was one that "had to do with the process when letters were to be delivered that there would be equality -- let's say that the salaries were going to be lowered or if their permanency was going to be removed, well, then it would be the same for everyone notwithstanding the person [or regardless of the pressure] involved." This testimony by plaintiff's own witness establishes that Delgado indicated that the reclassifications would be done with "equality" and that changes in permanence or salaries would be implemented regardless of the people affected (or the pressure involved). This testimony -- elicited by plaintiff's counsel during her case-in-chief -- supports defendants' claims that they implemented the reclassifications in a neutral manner.

E. <u>Analysis of the Evidence</u>

This evidence is not sufficient to show that plaintiff's political affiliation was a substantial or motivating factor in

-30-

defendants' decision to reclassify her under the 1991 plan.  In fact, the evidence presented at trial does not create a reasonable inference that defendants were even <u>aware</u> of Vázquez's political affiliation at the time her personnel file was reviewed and she was reassigned according to the 1991 plan.  We encountered a factually similar situation in <u>Gonzáles-De Blasini</u> v. <u>Family Dept.</u>, 377 F.3d 81 (1st Cir. 2004).  There, we affirmed dismissal of a plaintiff's political discrimination claim because plaintiff

> adduced no evidence that the defendants knew she was  a member of the NPP.  She attempts to bolster her political discrimination cause of action by alleging that [defendants] must have been  aware  of  her  political  affiliation because she was a well-known supporter of the NPP in the community, had held a previous trust position under the NPP administration, and  was  allegedly  demoted  shortly  after  the PDP  assumed  power.  [Plaintiff]  points  to [defendant's]  statement  that  she  wanted [plaintiff's] office and position to go to an employee of her trust as indication of a causal link between her political beliefs and the change in her employment conditions.

<u>Id.</u> at 85-86.  In <u>Gonzáles-De Blasini</u>, we held that such evidence was "insufficient  to  show  that  political  affiliation  was  a substantial factor in the challenged employment action."  <u>Id.</u> at 86.

Vázquez has shown no more here.  The fact that Santiago met Vázquez during routine campaign canvassing, and that Vázquez then identified herself as a member of the NPP and an employee of Mayor Soto's, does not lead to a reasonable inference that Santiago

-31-

or Delgado knew that she was a member of the NPP when they conducted their review of all personnel files for irregularities or when they met with her on May 22 as part of a group. Nor does Vázquez's testimony about her NPP activities or positions held under the previous administration support such an inference. Toa Baja is a city with almost 100,000 residents, and the city employed approximately 1,300 people. While Vázquez did occupy a trust position for about twenty months under Mayor Soto, she provided no evidence that her trust position was of such a high nature that defendants necessarily would have known who she was and her party affiliation. In fact, when asked on direct examination whether Santiago recognized her as an NPP member at the May 22 meeting, five or six months after Santiago introduced himself while campaigning, Vázquez did not answer in the affirmative. Instead, she stated only that "[h]e shook hands with me and greeted me."

Even if a jury could reasonably infer that defendants knew that plaintiff was a member of the NPP, that still is insufficient. Proving that her political affiliation was a substantial or motivating factor in the adverse decision requires more than "[m]erely juxtaposing a protected characteristic -- someone else's politics -- with the fact that the plaintiff was treated unfairly." Correa-Martinez v. Arrillaga-Beléndez, 903 F.2d 49, 58 (1st Cir. 1990). Indeed, the evidence falls short of even showing that Vázquez was treated "unfairly." Regardless of whether

she met the minimum educational and experiential qualifications, a disputed point on which we take Vázquez's version of events, the undisputed testimony establishes that Vázquez did not meet the statutory procedural requirements -- such as applying for and being interviewed for an advertised job in competition with other candidates, or serving the required probationary period -- for the Secretary III and Assistant Director appointments. Plaintiff's own witness, Sánchez, testified that the municipality simply did not hire personnel in accordance with these various provisions.

The mayor's alleged comment about "cleaning house" also is not sufficient to sustain plaintiff's burden. In Figueroa-Serrano, a plaintiff testified that the mayor said that "he was going to clean City Hall of most NPP employees. . . ." Figueroa-Serrano, 221 F.3d at 4.[16] In granting defendants' summary judgment motion, we observed that the plaintiffs relied on "generalized assertions of the defendants' affiliation with the rival political party" and the enactment of a personnel policy change after the elections. Id. at 8. "The only specific evidence that they offer is the sworn statement of a single plaintiff that [the mayor]

_____

[16]In Figueroa-Serrano, we found that plaintiffs failed to proffer sufficient evidence of political discrimination to defeat a summary judgment motion. Because the "standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that the 'inquiry under each is the same,'" Reeves v. Sanderson Plumbing Prod. Inc., 530 U.S. 133, 150 (2000) (citation omitted), we find our reasoning in Figueroa-Serrano instructive here.

voiced his intention to rid City Hall of NPP employees. They have failed to provide names or other specific factual information supporting their claim that the Municipality replaced them with new hires from the PDP." Id. We then characterized this evidence as a "meager showing" and held that it was "patently insufficient to generate a genuine issue of material fact on a causal connection between the political affiliation of the plaintiffs and the adverse employment actions alleged." Id.

Plaintiff has done no better here. Indeed, Vázquez's testimony regarding Santiago's "cleaning house" comment is even less forceful than the plaintiff's testimony in Figueroa-Serrano. There, the mayor allegedly said specifically that he intended to get rid of NPP members. Here, Vázquez did not even allege that kind of direct statement from Santiago. In contrast to Vázquez's case, we have upheld a district court's denial of motion for a judgment notwithstanding the verdict when the plaintiffs presented "ample evidence that [the defendant mayor] (1) knew plaintiffs were affiliated with NPP, (2) vowed to rid the [municipal] government of NPP members, (3) gave instructions to 'chop off the heads of the NPP members,' and (4) told municipal employees to switch to the PDP." Hiraldo-Cancel v. Aponte, 925 F.2d 10, 12 (1st Cir. 1991). Vázquez has produced no comparable evidence here.

Importantly, Vázquez also offered no evidence that PDP members were hired to replace the reassigned NPP members. In fact,

-34-

Santiago's uncontradicted testimony was that he had not appointed anyone to a career position since he took office. Vázquez also offered no evidence that the reassignments were effectuated in a discriminatory or differential manner, or that they were targeted at NPP employees. Plaintiff's own witness, Rivera, stated that Delgado told her that if the result of reassigning people according to the 1991 plan was that it would be done with "equality" and if "the salaries were going to be lowered or if their permanency was going to be removed, well, then it would be the same for everyone notwithstanding the person [or regardless of the pressure] involved." The defendants presented uncontradicted testimony that they were reviewing every personnel file in the municipality and that members of all parties were affected by the reassignments. These facts distinguish this case from the scenario presented in Acevedo-Garcia v. Monroig, 351 F.3d 547 (1st Cir. 2003). There, "[p]laintiffs . . . produced evidence supporting their theory that the termination plan was implemented in a way designed to target members of the NPP while sparing most members of the PDP. Further, the jury heard evidence that the vast majority of people hired with extra-municipal funds belonged to the PDP." Id. at 565-66. Vázquez has made no such showing.

At first blush, the actions and statements by Martinez, Vázquez's supervisor, are troublesome. Martinez failed to provide adequate work to keep Vázquez occupied for five months, and

Martinez also allegedly stated that "[w]ell, hopefully they will kill all the NPPers." However, Vázquez makes no showing as to why defendants should be held liable for Martinez's actions.[17] Vázquez admitted that she informed neither Delgado nor Santiago about her lack of work, and she admitted that Martinez gave her sufficient work after Vázquez's memo of August 24, 2001. Vázquez offered no evidence that Martinez's actions reflected a municipal "custom or practice [that] is so well settled and widespread that the policy-making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997) (quotations and citations omitted) (cited in Acevedo-Garcia v. Monroig, 30 F. Supp. 2d 141, 152 (D. P.R. 1998). Unlike in Acevedo-Garcia, where discriminating supervisors "claimed to be acting on the orders of 'higher up' officials within the Municipality, including [the defendants]," id., Vázquez has produced no such evidence here. Furthermore, Martinez's alleged comment is akin to the kind of isolated stray remark by a nondecisionmaker that we have held has limited probative value in other contexts. See, e.g., Gonzalez v. El Día, Inc., 304 F.3d 63 (1st Cir. 2002) (explaining that in the context of an age discrimination claim, "'stray workplace remarks,' as well as

_____

[17]For purposes of our analysis here, we will assume that Martinez's actions actually amount to political retaliation.

statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus").  While Martinez was the decisionmaker regarding Vázquez's workload, plaintiff offered no testimony that Martinez was involved in any way in the decision to rescind the 1997 plan as null and void or in the review of Vázquez's personnel file and reassignment.

The plaintiff presented no evidence that Santiago or Delgado created an atmosphere of discrimination or a policy of leaving NPP employees without work, and she made no claim that Martinez was implementing any such policy during the months that Vázquez had insufficient work.  In fact, plaintiff's witness Rivera testified that the fourteen NPP employees she supervised were always provided with adequate work.  In sum, whatever problems Vázquez may have had with her immediate supervisor, Vázquez presented no evidence that any comment or action by Martinez is fairly attributable to the defendants in this case, and, on these facts, Martinez's statement is not probative of whether defendants acted with discriminatory animus.

In short, plaintiff failed to show that her political affiliation was a substantial or motivating factor in her demotion or alleged constructive discharge.  Although plaintiff's allegations of "political discrimination can be built on

circumstantial evidence of constitutionally suspect motivations" for the adverse employment action, Vázquez has offered only a mere scintilla of evidence of political discrimination. Her evidence does not amount to "the specific facts necessary to take the asserted claim out of the realm of speculative, general allegations." Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1173 n.5 (1st Cir. 1988).

## III.

We do not set aside jury verdicts lightly. Nevertheless, when plaintiff fails to adduce sufficient evidence for a jury to reasonably infer that plaintiff's political affiliation was a substantial or motivating factor in an adverse employment action, we must do so. For the forgoing reasons, we vacate the judgment and order the entry of judgment for defendants. The parties shall bear their own costs.

So ordered.