# United States Court of Appeals
## For the First Circuit

No. 04-2589

MIGUELINA PEGUERO-MORONTA,

Plaintiff,

MARIBEL NEGRÓN-ALMEDA, ET AL.,

Plaintiffs, Appellants,

v.

CARLOS GABRIEL SANTIAGO, ET AL.,

Defendants, Appellees,

VILMA JIMÉNEZ,

Defendant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

———————————

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

———————————

Pablo Landrau Pirazzi, with whom Aldarondo & López Bras was on
brief, for appellants.
Héctor Benítez-Arraiza, with whom Francisco Ríos-Rivera and
Llovet Zurinaga & López, P.S.C. were on brief, for appellees.

———————————

September 20, 2006

———————————

**LIPEZ**, **Circuit Judge**.  Maribel Negrón-Almeda, Aracelis Gascot-Cuadrado, and Nilda Pérez-Montalvo (collectively, "Plaintiffs"), former employees of Puerto Rico's Commercial Development Administration ("CDA"), brought suit against Carlos Gabriel Santiago, Susana Hernández Colon, and Vilma Jiménez (collectively, "Defendants"), officials of that agency, pursuant to 42 U.S.C. § 1983 for wrongful termination because of their political affiliation.  Plaintiffs asserted that these adverse employment actions violated their First Amendment rights under the United States Constitution.

At trial, Plaintiffs' case focused on the circumstances of their dismissals at the end of the probationary periods for their career positions.  At the close of Plaintiffs' case, Defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), asserting that Plaintiffs had not presented a prima facie case of political discrimination.  The district court granted that motion in part and denied it in part.  After Defendants presented their case, which sought to justify Plaintiffs' terminations because of their poor job performance, Defendants renewed their Rule 50(a) motion.  Relying on our decision in Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23 (1st Cir. 2004), which has now been vacated by the United States Supreme Court on the basis of its decision in Unitherm Food Sys. v. Swift-

Eckrich, 126 S. Ct. 980 (2006),[1] the district court concluded that Plaintiffs had presented insufficient evidence of political discrimination to get their case to the jury.[2] Conducting our own review of the evidence presented at trial, which includes a credibility contest between Plaintiffs and Defendants over the circumstances of Plaintiffs' job loss, we vacate the district court's judgment in favor of Defendants and remand for further proceedings.

## I.

Before we summarize the evidence in this case, we must describe the ruling of the trial judge at the heart of this appeal. The jury trial began on September 20, 2004. At the close of Plaintiffs' case on September 21, 2004, Defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a), asserting that Plaintiffs had not presented sufficient evidence to reach the

---

[1] See Vázquez-Valentín v. Santiago-Díaz, 126 S. Ct. 1329 (2006).

[2] Vázquez-Valentín v. Santiago-Díaz was another political discrimination case from Puerto Rico. There, we reviewed a district court's denial of the defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The defendants asserted that the plaintiff had presented insufficient evidence of political discrimination to permit the case to go to the jury. We agreed. See generally 385 F.3d at 23. However, in order to conduct that evaluation of the defendants' motion, we excused the defendants' failure to preserve that ground pursuant to Fed. R. Civ. P. 50(b), which requires renewal of a Rule 50(a) motion after the jury has returned a verdict. In Unitherm, the Supreme Court ruled that a party must renew its Rule 50(a) motion pursuant to Rule 50(b), or that ground for appeal is waived. See generally 126 S. Ct. at 980.

jury on their case of political discrimination. Specifically, Defendants argued that Plaintiffs had not demonstrated that their political affiliation was a substantial or motivating factor in their terminations. The district court granted Defendants' Rule 50(a) motion in part and denied it in part:

(1) All claims against Vilma Jiménez ("Jiménez"), Director of Human Resources and Legal Services, were dismissed;

(2) The claims brought by Maribel Negrón-Almeda ("Negrón") and Aracelis Gascot-Cuadrado ("Gascot") against Susana Hernández Colon ("Hernández"), a Human Resources Officer, were dismissed;[3]

(3) The First Amendment claim of Nilda Pérez-Montalvo ("Pérez") against Hernández survived;

(4) The First Amendment claims of all of the Plaintiffs against Carlos Gabriel Santiago ("Santiago"), Administrator of the CDA, survived.

At the close of their case on September 27, 2004, Defendants moved for judgment as a matter of law a second time on the remaining claims, on essentially the same grounds as their

---

[3] Plaintiffs do not appeal these dismissals prompted by Defendants' first Rule 50(a) motion. Plaintiffs had also brought claims pursuant to Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 LPRA §§ 5141 and 5142. These claims also did not survive the district court's first Rule 50(a) ruling, and Plaintiffs did not appeal that ruling. We also note that the court dismissed the claims of another plaintiff, Miguelina Peguero-Moronta, prior to trial in an Opinion and Order dated March 31, 2004. She is not involved in this appeal.

first Rule 50(a) motion. Ruling from the bench that same day, the district court granted Defendants' motion. In presenting their renewed Rule 50(a) motion, Defendants relied heavily on our decision in Vázquez-Valentín, which was published during the trial. It is also apparent from the record that the district court reviewed Vázquez-Valentín during the noon break between the morning session of the trial -- when Defendants made their second Rule 50(a) motion -- and the afternoon session when the district court ruled on the motion. The district court explained its reading of the import of Vázquez-Valentín in these terms:

> If this case -- if the case of Vázquez-Valentin did not meet the standard of proof for jury submission as to the fact of whether political discrimination was a substantial or motivating factor in the challenged employment action, then this case, that we are trying now, the one that is before us, doesn't meet it, either.
>
> The truth of the matter is that the case of Vázquez . . . contained a lot more evidence of potential discriminatory motives and of a circumstantial nature than the one that we are trying.
>
> So under those circumstances, it seems to me that I don't see how I can let this case go to the jury . . . . I recognize, and I know, on the basis of my experience, that when these things happen in the context of positions like this, usually you have to look carefully, because there is always the good possibility that improper political motives were behind the personnel action. But it is not what I think; it is what the evidence sustains.
>
> And obviously, the problem that I have here is that there is no evidence other than a scintilla of evidence to let this case go to a jury, and this case [Vázquez-Valentín] is extremely clear as to what is required. And the case before me doesn't satisfy the standard.
>
> . . . .

> So on the basis of that, I have no other alternative but to disregard my own feelings as to what the case is and enter a judgment under Rule 50, dismissing it on the basis of insufficiency of evidence on the issue of political discrimination under this case of <u>Vázquez</u> v. <u>Santiago</u> [sic]. No other alternative.

Plaintiffs read this ruling as reflecting the district court's focus on the evidence in their case only and a disregard of the evidence presented by Defendants. If, in fact, the district court examined only the evidence presented in Plaintiffs' case when granting Defendants' renewed Rule 50(a) motion, this would be an error of law. <u>See</u> Wright & Miller, <u>Federal Practice and Procedure</u>, <u>Civil 2d</u> § 2534 (2d ed. 1994) ("A renewed [Rule 50(a)(1)] motion will be judged in the light of the case as it stands at that time."); <u>Potti</u> v. <u>Duramed Pharms, Inc.</u>, 938 F.2d 641, 645 (6th Cir. 1991) ("Our review of whether there was [sufficient] evidence [to survive judgment as a matter of law] . . . must be based on the entire record, not just the record at the end of plaintiffs' case, because [the defendant] proceeded to offer evidence in its own defense.").

Although Plaintiffs' reading of the district court's ruling is plausible, Defendants advance an equally plausible reading -- the district court evaluated all of the evidence adduced during the trial when it announced its bench ruling. For example, in an exchange with defense counsel concerning the renewed Rule 50(a) motion, the district court insisted "[r]emember, I wanted the [sic] hear the evidence as a whole."

In the end, we need not decide which characterization of the district court's ruling is accurate. Even if the district court had unambiguously focused only on Plaintiffs' evidence -- and hence had committed an error of law by disregarding Defendants' evidence when ruling on the renewed Rule 50(a) motion -- we could not rule in Plaintiffs' favor if, in fact, the totality of the evidence did not permit their case to go to the jury. We engage in de novo review of the district court's decision granting judgment as a matter of law. See Webber v. Int'l Paper Co., 417 F.3d 229, 233 (1st Cir. 2005). We can affirm on any basis available in the record because "[w]e are not wedded to the lower court's rationale, but, rather, may affirm its order on any independent ground made manifest by the record." InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003). Therefore, the dispositive question on appeal is whether, in light of the totality of the evidence, the district court correctly ruled that there was insufficient evidence of political discrimination to permit the Plaintiffs' case to go to the jury. To pursue this inquiry, and to provide an adequate basis for explaining our decision, we must first set forth in some detail the evidence adduced at trial.

On November 7, 2000, general elections were held in Puerto Rico. The Popular Democratic Party's ("PDP") candidate for governor won that election, leading to a change of administration from the incumbent New Progressive Party ("NPP") to the PDP. Defendant Santiago was appointed Administrator of the CDA on or about January 7, 2001. As such, he was in charge of all of the CDA's operations. At the time of the change in regime, Defendant Hernández served as a Human Resources Officer and Officer of Labor Relations, meaning that she carried out hiring and termination decisions and managed payroll, with Santiago's approval. Plaintiff Pérez worked in the human resources department of the CDA, where she maintained attendance and payroll records. Plaintiff Negrón served as the director of the general services division. She was responsible for supervising the maintenance of the CDA's physical plant and equipment, obtaining supplies, and providing support for the vehicles and equipment of her division. Plaintiff Gascot was director of the CDA's management and entrepreneurial school. Her duties included managing the school's equipment and physical resources, budgeting, and planning the school's curriculum.

Within three to four weeks after the change of administration in early January 2001, all of the Plaintiffs had lost their jobs at the CDA. Plaintiffs' case consisted almost entirely of descriptions of what happened to them in those three to

four weeks, and the circumstances of their terminations from the CDA. Defendants' case consisted entirely of explanations of why they were justified in terminating Plaintiffs. Although the trial lasted six days, and included other witnesses,[4] we summarize only the testimony of the three Plaintiffs and the two remaining Defendants. For the testimony of each of the Plaintiffs -- Pérez, Negrón, and Gascot -- we divide the summary of their testimony into three sections: (1) before the change of administration; (2) after the change of administration; and (3) political affiliation testimony. Then we summarize the testimony of Defendants -- Santiago and Hernández -- with Santiago's testimony related as it pertains to each of the three Plaintiffs; and Hernández's related only as it pertains to Plaintiff Pérez. As noted earlier, the First Amendment claims of each of the three Plaintiffs against Santiago survived Defendants' first Rule 50(a) motion. But only Pérez's claim against Hernández survived that same motion.

**A. The Plaintiffs**

**1. Nilda Pérez-Montalvo**

### a. Employment history before Santiago's arrival

Pérez obtained a bachelor's degree in economics and a master's degree in business administration, specializing in human

---

[4] The other witnesses were the respective Plaintiffs' spouses. Their testimony included their observations of their spouses in the aftermath of their dismissals from the CDA, and the impact those dismissals had on their households.

resources.  She worked in government for about nine years before leaving to raise her children.  At the time she left, she served as an economist at the Statistics Bureau in the Department of Labor.  After her children matured, she decided to return to work.

She returned to work first in the private sector at a temporary employment services company, Top Notch.  Top Notch told her to apply for a vacant secretarial position in the CDA administrator's office, which she obtained.  While working in the administrator's office, Pérez applied for and obtained a career position in the CDA's human resources office.[5]

Pérez stated that her first task in her position in the human resources department was to update the time cards of all CDA employees, which had fallen behind since her predecessor's departure in December 1999.  She was "supposed to check the time cards, the weekly time cards, that all the employees had to punch and check to see if they had worked every day, if they had not worked every day.  See if they had taken leave . . . .  In other words, I was supposed to record their attendance on a weekly basis."  Pérez testified that she performed this work, at least

_____

[5]  "Puerto Rico law distinguishes between 'career' employees and 'trust' employees. Career employees are permanent and may only be removed from their positions for just cause after due filing of charges.  By contrast, trust employees shall be of free selection and removal, i.e., removable with or without cause." Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 23 n.2 (1st Cir. 2006) (internal citations and quotation marks omitted).

initially, on an adding machine, which her predecessor had done, despite her knowledge of computer programs and usage. Subsequently, she began to use a computer to do her work. She stated that the attendance records were current up to December 2000 at the time of her termination.

As a probationary employee, Pérez was subject to periodic evaluations of her performance during the probationary period, which spanned from July 15, 2000 to January 15, 2001. She was evaluated three times prior to Santiago's appointment as head of the CDA for the following time periods: (1) July 15, 2000 to September 15, 2000; September 18, 2000 to November 15, 2000; and (3) November 16, 2000 to December 31, 2000. These prior evaluations, all of which were positive, were signed by Margarita Martinez, who was the director of the human resources department for this period (and replaced by Jiménez when the administration changed). However, Pérez understood that Hernández, not Martinez, was her immediate supervisor, although Pérez was never officially told this.

**b.** **Employment history following Santiago's arrival and alleged performance deficiencies**

Pérez stated that her final evaluation for her position in the human resources department covered the period from January 1, 2001 to January 15, 2001, the final day of her probationary period. She was evaluated by Hernández, her superior in the human resources office. However, Pérez also stated that, during those

fifteen days, she and Hernández were actually in the office at the same time for only six and a half days because of weekends and holidays. On this final written evaluation, Hernández had written that Pérez was not receptive to instructions, unreliable, and "rarely willing to collaborate."

No one reviewed Pérez's final evaluation with her. Also, Pérez never received any verbal admonishment or reprimand for the various mistakes reported on the final evaluation. The written evaluation was handed to her on her final day at the CDA, which was January 12, 2001.[6]

On cross-examination, defense counsel questioned Pérez's testimony that she had never been verbally reprimanded for errors she committed in her work. Defense counsel also asked about the details of those instances of error. Pérez claimed that she had no recollection of having committed any errors. Defense counsel also

---

[6] Defendants' Exhibit Number 9, Circular Number 580 -- entitled "Guidelines on Probationary Periods" -- from the Central Office of Administration of Personnel for the Commonwealth of Puerto Rico, which Santiago reviewed during his testimony under direct examination, states in relevant part:

> It would be enough to warrant a separation of an employee in a probationary period when an intermediate evaluation or a final evaluation of the employee doesn't reach the expected level in one or more of the factors for evaluation . . . if, in the supervisor's criteria, most of the deficiencies constitute sufficient cause to justify such separation . . . . If the employee has had more than one supervisor in different periods of evaluation, it can be enough to use the criteria of one of the supervisors for separation if this one considers such action is to be taken.

questioned Pérez regarding the necessity of using a computer to complete the tasks assigned to her. Pérez contended that a computer was necessary to perform her tasks "efficiently".

### c.  Political affiliations

Pérez testified that she was affiliated with the NPP and had been since she was a teenager. During election years, she had attended party meetings. Although Pérez testified that she knew Hernández's political affiliation, she never explicitly identified that affiliation for the court. As to Santiago, Pérez knew that he was the new appointee for Administrator of the CDA for the incoming PDP administration.

Regarding Defendants' knowledge of her political affiliation, Pérez stated that her affiliation with the NPP was widely known at the CDA. Politics was openly discussed at the office, particularly during the 2000 election year, and she was "very open about [her] affiliation . . . . When [she] obtained the position in the human resources office [she] spoke with [her] fellow co-workers there about [her] political affiliation." Just before the 2000 elections, she stated that she had left to attend an NPP meeting during her lunch hour and all of her co-workers saw her leave. While Pérez never directly discussed politics with Hernández, she believed that Hernández knew her political affiliation because there were only six people in her office at the CDA. In her prior position in the CDA administrator's office, all

-13-

of the employees were affiliated with the NPP, and she "didn't hide [her affiliation] because [she] didn't have reason to."

**2. Maribel Negrón-Almeda**

### a. Employment history before Santiago's arrival

Negrón had a bachelor's degree in business administration. After obtaining her degree she began work in the private sector, where she worked until she married and left the workforce for a time. After that break, she began working at the CDA shortly before the change in administration. Her position, a career position, had a six-month probationary period from August 1, 2000 to January 31, 2001.

Negrón testified that she was evaluated three times prior to Santiago's arrival at the CDA for the following time periods: (1) August 1, 2000 to September 30, 2000; (2) October 1, 2000 to November 30, 2000; and (3) December 1, 2000 to December 31, 2000. Juan Matos Gonzalez, Negrón's supervisor and the auxiliary superintendent of the CDA prior to the change in administration, performed these evaluations, all of which were positive. Gonzalez occupied a trust position and tendered his resignation effective December 31, 2000. To Negrón's knowledge, no one was appointed to replace him following Santiago's arrival.

### b. Employment history following Santiago's arrival and alleged performance deficiencies

Plaintiffs' counsel asked Negrón about some "incidents" that occurred following the arrival of Santiago. One incident

-14-

involved changing the locks on the door of Santiago's office. According to Negrón, Santiago's secretary instructed her to have the lock installed a certain way, and Negrón contacted the appropriate company and conveyed these instructions. However, the technician installed the lock incorrectly. "The following day [Negrón] was told there was a problem. [She] once more called the company. The company came back and they once more reinstalled the lock." The only verbal admonishment Negrón acknowledged "had to do with [this incident]. That was the wrong way. So we proceeded to change it."

Another incident involved the placement of some file cabinets and other furniture, including a counter/desk. Negrón testified that once she received the requests from Santiago, she attempted to contact the two employees who performed these duties; however, the position for one of those employees was vacant, and the other employee was "quite old[,] and those file cabinets weighed approximately 100 pounds." She informed Santiago of the problem, but told him that she would ask two other employees to do the moving. Because these two employees were not specifically tasked with this type of work, they had to coordinate schedules to find a time that would work, which caused a delay in the moving of the cabinets. To Negrón's recollection, Santiago was pleased with the work that was done.

Negrón also recalled Santiago asking her "to have an air conditioner duct moved which was in his office." She "coordinated with the company that had the air conditioning contract . . . [and] received the estimate for the work." However, that work was never carried out while Negrón was at the CDA "because [Santiago] never signed the authorization for [her]."

On her final evaluation, for the period from January 9, 2001 to January 31, 2001, Santiago gave her failing marks. In the written evaluation Negrón received, Santiago stated that Negrón had ignored his instructions and performed tasks carelessly and negligently. The evaluation contained similar comments about her cooperativeness. Negrón stated that Santiago never discussed his negative evaluation with her. Negrón testified that Santiago gave the evaluation to her at the end of the work day on January 31, 2001, her final day at the CDA, and informed her that she did not pass her probationary period.

On cross-examination, defense counsel questioned Negrón's account of her performance of the tasks requested by Santiago. Specifically, he asked her: whether the furniture and file cabinets were moved on the same day that she was told to have them moved; for more details as to why the air conditioner was never installed; and whether the lock had been installed improperly because she conveyed inaccurate instructions to the technician. Negrón responded that: any delay in moving furniture and file cabinets was

-16-

caused by unavoidable logistical issues, and the objects were moved as fast as possible; the air conditioner was not installed because Santiago never gave proper written authorization; and the improper installation was the result of an error by the technician (rather than an error in her instructions) that was corrected as soon as was possible.

### c. Political affiliations

Negrón testified that she had been affiliated with the NPP since "[she] was very young." This affiliation was formalized in June 2000 when she went to an NPP office and filled out paperwork to that effect. Negrón stated that she knew the political affiliation of Santiago: "[D]uring the few times that I was able to talk to him he would stress that he enjoyed the full trust of the governor and he would always say that he enjoyed a position of trust because he had the governor's trust, so I understood that he had -- he was affiliated to that party [PDP]." In particular, Negrón recalled Santiago raising this issue of political affiliation when he asked her to change the car that had been assigned to him at the CDA.

As for Defendants' knowledge of her political affiliation, Negrón believed that her affiliation was known at the CDA because "the elections were already approaching by that time. . . . [I]n my area people would talk. . . . We would talk about who would win and who would lose . . . . We would talk and you

would talk about who you felt was going to win and everybody just knew your party."

## 3. Aracelis Gascot-Cuadrado

### a. Employment history before Santiago's arrival

Gascot had a bachelor's degree in business administration, with a focus on secondary education, and a master's degree in administration and supervision of schools. She worked as a teacher in a number of high schools, and then later in a superintendent's office until 1993 when she began working in the CDA as the entrepreneurial director, which at that time was categorized as an "Assistant II" position. She worked in this position for seven years. In the spring of 2000, Gascot became aware of a posting, dated April 14, 2000, for the position of director of the CDA's management and entrepreneurial school, a career position. She applied for and obtained this position, which had an "eight-month probation period [and] I was to have evaluations every two months . . . the first evaluation undertaken from June the 1st to July the 31st. The first of the first two months of work." The probation period would end on January 31, 2001. Gascot's duties included managing the school's equipment and physical resources, budgeting, and planning the school's curriculum.

Within that eight-month period, Gascot was evaluated for the following time periods: (1) June 1, 2000 to July 31, 2000; (2)

-18-

August 1, 2000 to September 30, 2000; (3) October 1, 2000 to November 30, 2000; and (4) December 1, 2000 to December 31, 2000. These evaluations were performed by Gonzalez. Gascot received all positive evaluations. After Gonzalez's departure following the change in administration, Gascot was not informed of anyone taking Gonzalez's position.

### b. Employment history following Santiago's arrival and alleged employment deficiencies

Aside from a general, agency-wide meeting where he was introduced to the CDA as the newly-appointed administrator on January 9, Gascot recalled only "one occasion in which [she] met personally with Santiago," which occurred on January 14 or 15. On that occasion she went to his office: "[a] group of employees was dismissed [from their jobs] and he asked me to explain to him regarding an aid program for them. I explained to him what the program was about, and what was normally done." Gascot stated that Santiago never discussed the nature of her work at the CDA and never conducted any evaluation of the program she directed. Gascot testified that "during the transitionary period a report was made for the work performed at the school and it stated the amount of participants which had increased and the working plan." While it is unclear from the record whether Gascot prepared this report herself, Gascot stated that Santiago never requested from her either statistics about the school or that working plan.

-19-

On her final evaluation, for the period from January 1 to January 31, Gascot noted that as to her planning, organization, and performance, Santiago had written the same thing: "improper utilization of funds and resources available in the offering of courses, careless in the effective maintenance of the vehicle assigned to the school." Gascot testified that this "evaluation was not discussed with me at any time" and "was given to me on January 31, 2001. That was the date that ended my probation period." On January 31, Gascot was told not to leave work that day without going to the administrator's office. She went to the administrator's office at 5:10 pm, where she was handed a letter that read, in part: "[i]n view of the above, effective today, January 31, 2001, you are being separated from the position you have been occupying at the agency. If you are not in agreement with this decision you are entitled to discuss it within the next ten days with the personnel administration." Gascot stated that "[w]hen the document was given to me and I was about to talk . . . [Defendant] Ms. Vilma Giménez [sic] tells me that that [sic] is not the forum for me to talk."

According to Gascot, it was only later, through Santiago's deposition, that she learned why Santiago had given her such a negative final evaluation. Gascot recalled that Santiago had "said that [she] had been assigned a mobile unit [truck] . . . [which] was deteriorated and [she] had used it wrongly and it was

not well used and there were badly used funds." To Gascot's knowledge, the vehicle was purchased by a prior administrator in 1995 or 1996 for the CDA. It was her understanding that "[a]ll agency vehicles are under the General Services Administration. They are the ones who provide maintenance of the vehicles." Gascot claimed that she never used the vehicle during her time as director of the managerial school. Gascot also learned through Santiago's deposition that rumors came to him from other business centers and business people that the courses were "inefficient" and "nonoperative," but he could not recall the names of anyone from whom he heard these rumors.

On cross-examination, Gascot again testified that she believed that the agency vehicle for which Santiago held her responsible was, in fact, "the responsibility of the general services department," which, as of August 2000, was run by Negrón.

### c. Political affiliations

Gascot stated that she was affiliated with the NPP, and had been since she first voted forty (40) years ago. She participated in ladies' groups, political reelection groups, and professional agencies. She also belonged to an NPP group comprised of CDA employees that met outside of working hours. During the 2000 election, Gascot participated in municipal campaigns, and served as an election functionary, checking voter lists. Gascot testified that she knew the political affiliations of both

-21-

Hernández and Santiago -- they were both members of the PDP. As to Hernández, Gascot stated that Hernández "had been working [at the CDA] for many years. She has held high posts within her town. She's also worked within her political party and it is known throughout all the [CDA] employees that she belongs to the Popular Democratic Party." As to Santiago, Gascot testified that "when he came to the [CDA] he came from COFEC [Corporation for the Economic Development of the Capital City] . . . . It was a department within the municipality of San Juan created when Sila Maria Calderon [the new PDP governor] was there."

Gascot testified that her affiliation was known at the CDA because she first arrived at the CDA as a special aide under an NPP administration, a trust position. Gascot recalled specifically that Hernández had direct knowledge of her affiliation. Gascot recalled an incident when she first started working as the director of the managerial school. Hernández, who Gascot identified as the "institutional brain" of the CDA, asked her to identify her political affiliation. By "institutional brain," Gascot understood Hernández to be an individual who "dedicate[s] themselves to identify[ing] the [political affiliation of the] people when they come in." Hernández was "the person who knows everybody in there."

**B.  The Defendants**

**1.  Carlos Gabriel Santiago**

Before being appointed as head of the CDA, Santiago was appointed the executive president of COFEC, "a corporation of economic development for the capital city [of Puerto Rico].  It is a development company which gives loans to small businesses in San Juan and also other municipalities in the island."  He was appointed by COFEC's board of twelve directors.  He became administrator of the CDA on January 7, 2001, and he "stopped being the director in January 2002."

**a.  Pérez**

While Santiago acknowledged that Hernández made the final decision on Pérez's retention of her position following her probationary period, he stated that Hernández had consulted with him.  Hernández told him that she "wasn't satisfied with the inefficient way that Pérez was performing the task of her job, and [Hernández] understood that [Pérez] wasn't going to fulfill the expectations of the position."  Santiago ultimately endorsed Hernández's dismissal of Pérez.

On cross-examination by Plaintiff's counsel, Santiago conceded that prior to Pérez's termination, Santiago did not speak to her to discuss his intentions to terminate her.  He admitted that he did not remember if Hernández had told him about Pérez's

educational qualifications or the fact that Pérez's position had been vacant for six months prior to her filling that position.

### b. Negrón

Santiago stated that he got to know Negrón and that "her performance was low, very low . . . more than poor.  It was just bad."  He testified that he gave her instructions to move furniture and file cabinets, change locks, and repair air conditioners.  As to the moving of furniture and file cabinets, he stated that he gave Negrón the instruction personally, but she did not comply.  Moreover, Santiago stated that Negrón misplaced the file cabinets "because it was more than an issue of instructions or permission.  It was more of [Negrón] started establishing territory in the agency . . . .  So it was more of hostility to me."  He stated that the file cabinets were misplaced and Negrón's reaction was simply "[t]hat there was no space anywhere else except in my office."  On another occasion involving the moving of files, according to Santiago, it "took a few days, three or four days, because the argument was the same: There was no space, so those had to remain there."

As to the counter/desk, Santiago stated that Negrón "counterordered" the moving of the counter from a location preferred by Santiago. He felt "concerned and even pressured psychologically because the situation was more than just me saying things one way and things happening another.  And it was more of a

controversy." As to the air conditioning duct, Santiago confirmed that the air conditioning in his office was never repaired. He also confirmed that the reason "was that the order had to be in writing." However, Santiago testified that he thought this was unreasonable. "[Negrón] insisted that every task that she was ordered to do, even if it was the simplest of tasks, had to be in writing . . . it wasn't enough that it had to be [in] a memorandum for [Negrón], but it also had to be -- the requisition had to be signed. . . . the process was done twice for whatever was needed." According to him, he asked Negrón three times to fix the air conditioning duct, and it was never done.

As to the installation of a new lock on his office door, Santiago recalled that he was in his office when it was installed. After the installation, when he went to leave, "the lock [was] installed inside out, meaning that the lock that has the key is on the inside, and on the outside is the part where you can do it manually. . . . And so I am locked in my office. I am trapped." His specific complaint was that Negrón did not remain to supervise the installation of the lock. In his opinion, with the lock incident as an exemplar, "it was impossible to articulate a particular operational plan with [Negrón] because, if things this simple could not be solved and saying that this was simply a mistake . . . it was something that would concern any supervisor . . . . it even got to the point in my mind that I concluded that, if

ever there was a person that was not going to cooperate . . . it was [Negrón]."

On his final evaluation of Negrón, regarding the "performance" factor, Santiago stated that Negrón "did not meet the goals and objectives, be them small as they could be, and also the effective solutions of unforeseen situations like the one regarding the lock . . . . It shouldn't be the duty of a director to constantly be in controversy with the head of an agency. It [was her duty] to keep in operational conditions the physical facilities of the agency, which [Negrón] did not perform, did not do." As to the "cooperation" factor, "[Negrón] didn't have the appropriate attitude. It was more of a serious problem in terms of personality in terms of trying to be in controversy all the time. And also to collaborate . . . that never happened. . . . And to obtain the maximum effort from the personnel. [Negrón] never complied with this. On the contrary, she prevented things from happening." According to Santiago, the period from January 9 to January 31 was "more than enough" time to observe Negrón's performance. He treated this stretch of time as 20 days.

On cross-examination, Santiago revised this number of days for observing Negrón to 16. He also admitted that his office was isolated from Negrón's (a floor away) such that he only observed her when the two had direct interaction. Santiago conceded that one of the pieces of furniture that he requested be

moved, a counter, was something that Negrón could not move on her own. As to the lock, Plaintiffs' counsel asked, among other things, why Santiago did not prevent the incorrect installation of the lock since he was in his office when it was installed. Santiago stated that he was occupied with work and that the door was actually some distance from his desk. As to the air conditioning problem, Plaintiffs' counsel asked Santiago whether it was in fact reasonable policy for Negrón to have written authorization for work done in order to keep a record for accounting purposes, and because checks were issued by a separate department of the CDA. Santiago replied that Negrón's paperwork "was additional," meaning redundant. Plaintiffs' counsel also questioned Santiago as to the difficulty of completing Negrón's paperwork (essentially, writing "Approved"). Santiago responded that it would set a problematic precedent, requiring signatures for everything.

### 3. Gascot

Santiago stated that he had an opportunity to evaluate Gascot's performance, which he described as "'poor,' that it did not meet the standard." He claimed that as far as planning, coordinating, and directing the entrepreneurial school, Gascot "peformed duties that were more of a routine, more of a day-to-day operational basis and instead of planning and coordinating and looking to the future, that effort did not exist." As to the

agency vehicle in dispute, Santiago stated that Gascot "and I had had our differences in how to use the mobile truck to the entrepreneurial school, the fact that it had been abandoned in the parking lot of the agency to be deteriorated." He testified that the vehicle was assigned to the entrepreneurial school; the funds for it came from the entrepreneurial school; and the side of the vehicle said "Commercial Development, Entrepreneurial School." Santiago identified documents confirming the disrepair of the vehicle, dated December 28, 2000 and January 11, 2001. Additionally, auditors from the controller's office requested documents and information from Negrón regarding the purchase, maintenance, and future use of the agency vehicle in question.

Santiago stated that he believed that no one in the CDA wanted to be responsible for the vehicle -- "[t]he entrepreneurial school said it was from general services, and general services said it belonged to the entrepreneurial school." In summary, Santiago expected Gascot "[t]o assume responsibility, to assume responsibility for things that are under her direct supervision . . . [b]ut that didn't even happen." Santiago also claimed that he "never saw [an] annual plan [for training services] from" Gascot. He continued "I honestly think that . . . Gascot didn't have the capacity to prepare such a plan."

Santiago also testified that Gascot failed to develop or propose a number of plans: a "capacitation plan" for communication

between the central school in San Juan and centers throughout the island; "a study of needs . . . to develop a study determining the needs for training which is offered to businessmen"; a "promotion advertising plan" for "what was going to be published in the advertisements." Additionally, he criticized Gascot for allowing "the course of offering of the entrepreneurial school [to] become obsolete or inefficient in terms to what the businessmen wanted."

Santiago claimed that he spoke to Gascot about all of these failures, but she gave her "usual response, that she didn't give me a clue -- or she didn't give me any way that I could believe that she was going to be in charge of that, that she would take care of it." He conceded that "[c]ertainly there were other issues" on his mind during the transition period, but that he devoted "from five to 10 hours" to the entrepreneurial school and Gascot. He stated that he "saw the [prior] evaluations in the file, but those evaluations were not in agreement with what [he] saw . . . of Gascot's work performance." He performed the final evaluation of Gascot with the help of Hernández and Jiménez.

On cross-examination, Santiago admitted that his office was a number of floors away from that of Gascot, and he only observed her when the two had direct interaction. He also identified a transition report that was given to him on his arrival at the CDA, which stated that the agency vehicle for which Gascot

was responsible was purchased from "General Services by Commercial Development Services" and that the vehicle was already eight years old when it was purchased, meaning it was twelve years old when Santiago first saw it. Santiago also conceded that evaluations of an employee's probationary period should only take into account actions performed during that period.

Plaintiffs' counsel also questioned Santiago about an apparent inconsistency between his testimony on direct examination and his response to an interrogatory prior to trial. The interrogatory had asked for any and all reasons for dismissing Gascot; Santiago listed and explained only the vehicle incident. He did not mention any inability to engage in planning. Santiago also stated that, even though he was an accountant, he did not check the agency's property ledger to determine, ultimately, who was responsible for the vehicle, but that he "must have sent somebody to check it."

Under further questioning from Plaintiffs' counsel, Santiago identified a 2000/2001 work plan for the entrepreneurial school, but stated that he had never seen the document. He also conceded that when he left the CDA a year after becoming its administrator, the courses being offered by the entrepreneurial school had not changed.

## 2. Susana Hernández Colon

Hernández's testimony focused only on Pérez.[7] On direct examination, Hernández testified to a number of instances where Pérez "worked [] attendance sheets without being duly authorized by the immediate supervisor . . . meaning that the agency would pay employees that had not been working." However, on questioning by the district court as to whether "somebody else could have been at fault," Hernández conceded that it was possible "that more than one person may have been involved in this negligence." Hernández also recounted incidents where she directly asked Pérez to review the vacation ("leave") records of certain employees, including some outgoing ones. According to Hernández, Pérez committed errors on these types of records as well, the consequence being that "we would have paid the employee less days when the employee would have had a right to be paid their full days." Pérez was working on nine cases during her final probation period in January 2001, and Hernández testified that "this work area is simple. It is simple math that one has to do, but you are not simply calculating work days . . . out of nine cases, six cases that weren't worked right . . . I mean more than half the work that she did was bad."

Hernández testified that the only equipment necessary for attendance work was a calculator; a computer was unnecessary.

---

[7] As noted earlier, the claims of the other two Plaintiffs against Hernández had been dismissed by the district court in response to Defendants' first Rule 50(a) motion.

Hernández also stated that Pérez used a computer to do this work when other employees in the human resources department required use of a computer.  Later, Hernández "approached [Pérez], and [told her] that instructions had been given so that she would leave the desk that had the computer, move to another desk, so that the computer could be used by the human resources analyst."  According to Hernández, Pérez refused to move.

In her final evaluation of Pérez, covering January 1 to January 15, Hernández found Pérez had not been compliant in three areas: availability to learn, reliability, and cooperation.  As to availability to learn, Hernández stated that Pérez "was given instructions toward her work, toward specific functions . . . and she worked them wrong."  As to reliability, Hernández testified Pérez "didn't prove capable of following instructions.  Also . . . it is more that . . . she didn't want to do what was said to her. She didn't assume the responsibilities of the position."  As for cooperation, Hernández recalled specifically Pérez's refusal to allow others to use the computer that she was using.

On cross-examination, Hernández admitted that during Pérez's final period of probation, she actually supervised Pérez a total of only six to seven days.  She conceded that the final evaluation report was supposed to be given, in accord with regulations, ten days before the date of separation.  In Pérez's case, the final evaluation was only given on the date of

separation, which was January 12. Although in her final evaluation she speculated that Pérez did not want to continue working at the CDA, she acknowledged that four years ago she had considered Pérez a hard worker who would never leave her position.

Plaintiffs' counsel also questioned Hernández about Pérez's apparent errors. Hernández testified that some of the "errors" she testified to on direct examination occurred before she became Pérez's supervisor; that it is improper to evaluate an employee based on things that were done during a period for which the employee had already been evaluated; and that one type of error had nothing to do with Pérez at all. Hernández also stated that all of the attendance and payment records are recalculated at the end of a calendar year or when an employee leaves the agency before the end of the year. Errors made in the initial calculation are usually caught and corrected to avoid improper payment.

## III.

In light of this evidence, we must now decide if the district court ruled correctly that there was insufficient evidence of political discrimination for Plaintiffs' case to reach the jury. In conducting this review, we keep in mind that Rule 50(a) motions:

> will be granted only in those instances where, after
> having examined the evidence as well as all permissible
> inferences drawn therefrom in the light most favorable to
> non-movant, the court finds that a reasonable jury could
> not render a verdict to the party's favor. In carrying
> out this analysis the court may not take into account the
> credibility of witnesses, resolve evidentiary conflicts,

> nor ponder the weight of the evidence introduced at trial.

Figueroa-Torres v. Toledo-Davila, 232 F.3d 270, 273 (1st Cir. 2000) (quoting Irvine v. Murad Skin Research Labs, Inc., 194 F.3d 313, 316-17 (1st Cir. 1999)).  Even though we draw all rational inferences from the facts in favor of the non-moving party, that party "is not entitled to inferences based on speculation and conjecture." Ferreru v. Zayas, 914 F.2d 309, 311 (1st Cir. 1990). A non-moving party who bears the burden of proof, as Plaintiffs do here, must have presented "more than a mere scintilla of evidence in its favor" to withstand a motion for judgment as a matter of law.  Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 76 (1st Cir. 2001).  Additionally, we are not obligated to disregard uncontradicted evidence offered by defendants. Santiago-Negron v. Castro-Davila, 865 F.2d 431, 445 (1st Cir. 1989).

## A.  Proving and defending political discrimination claims

A government employee who does not occupy a policy-making position of confidence and trust, such as Plaintiffs here, is protected from adverse employment decisions based on the employee's political affiliation. See Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 7 (1st Cir. 2000).  A plaintiff bringing a political discrimination claim bears the burden of "producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that [his] constitutionally protected conduct -- in this case, political affiliation . . . was a substantial or motivating

-34-

factor behind [his] dismissal." Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (internal quotation marks omitted); see also Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977). A plaintiff bears the burden of persuasion on this issue throughout the case.

Proving that political affiliation was a substantial or motivating factor in an adverse employment decision requires more than "[m]erely juxtaposing a protected characteristic -- someone else's politics -- with the fact that the plaintiff was treated unfairly." Padilla-García v. Guillermo Rodríguez, 212 F.3d 69, 74 (1st Cir. 2000) (internal citation omitted); see also Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 52 (1st Cir. 2005) ("Statements of political affiliation -- unaccompanied by any specific factual information to support the claim and unrelated to any employment action taken by defendant against plaintiff are patently insufficient to establish an act of political discrimination.") (citing López-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir. 2000) (internal citation and quotation marks omitted)). The Supreme Court has cautioned that the mere fact that an adverse action was taken after an employee exercises First Amendment rights is not enough by itself to establish a prima facie case. See Board of County Comm'rs v. Umbehr, 518 U.S. 668, 684-85 (1996).

To meet this burden, political discrimination plaintiffs often present evidence of verbal or written statements of political or personal animus. See, e.g., Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 76 (1st Cir. 2006) (witness testified that a defendant had "made several comments to her to the effect that he was under political pressure for leaving too many NPP members in cushy positions"); id. at 78 (witness testified that a defendant insisted that she use phraseology consistent with a particular political party); id. at 81 (witness testified that the defendants "made statements to her indicating that her demotion was politically motivated"). Plaintiffs who have lost their jobs also present evidence about the hiring practices of the defendant in the wake of an election generally -- i.e., evidence that the defendants filled all, or most, recently vacated positions with supporters of their political affiliation -- or, more specifically, evidence that the plaintiff's immediate successor had the same affiliation as the defendant. For example, in Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97 (1st Cir. 1997), where "the plaintiffs were all members of the adverse party . . . their superiors knew this, and . . . their duties were given to active supporters of the party in power," we found there was ample evidence for the plaintiffs' case to avoid summary judgment. Id. at 101; see also Rodriguez-Rios v. Cordero, 138 F.3d 22, 24 ("[O]ther evidence adduced by plaintiff established a prima facie case . . . . [P]laintiff adduced that

<u>every</u> employment task for which she had been responsible prior to her demotion was performed thereafter by an NPP member and that at least three new recruits . . . were NPP members.").

A defendant, of course, can offer evidence challenging the claim that political affiliation played a substantial or motivating factor in the adverse employment action. Additionally, even if a plaintiff establishes by a preponderance of the evidence that political affiliation played a substantial or motivating factor in the adverse employment action, a defendant can raise an affirmative defense specific to this type of case: that is, a defendant can attempt "to prove by a preponderance of the evidence that [the] plaintiff [] would have been dismissed regardless of [his] political affiliation." <u>Acevedo-Diaz</u>, 1 F.3d at 66; <u>see</u> <u>also</u> <u>Mt. Healthy</u>, 429 U.S. at 287; <u>Sanchez-Lopez</u> v. <u>Fuentes-Pujols</u>, 375 F.3d 121, 124 (1st Cir. 2004).

In the language of burden-shifting, we have explained the <u>Mt. Healthy</u> affirmative defense as follows:

> [w]e stress that under the <u>Mt. Healthy</u> burden shifting scheme, unlike Title VII cases, the burden of persuasion actually shifts to defendants after plaintiff establishes a <u>prima</u> <u>facie</u> case. Under Title VII, once the plaintiff establishes a <u>prima</u> <u>facie</u> case, the employer need only submit enough evidence to raise a genuine issue of material fact -- i.e., only the burden of production shifts to the employer. However, in a First Amendment political discrimination case, in which the <u>Mt. Healthy</u> scheme is applicable, the burden of persuasion shifts to the defendant, and the plaintiff-employee will prevail unless the fact finder concludes that the defendant has produced enough evidence to establish that the

-37-

> plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons.

Cepero-Rivera v. Fagundo, 414 F.3d 124, 133 n.1 (1st Cir. 2005) (internal citations and quotation marks omitted).

## B.  The nature of Plaintiffs' and Defendants' cases

### 1.  Plaintiffs' case

Plaintiffs presented an unusual case of political discrimination.  They did not present any evidence of overt statements of political discrimination.  They also did not present evidence that employees of their political affiliation had been replaced predominantly by employees with an opposing political affiliation.  Plaintiffs did not even show that their own replacements, if any, had an opposing political affiliation. Instead, after showing that Defendants had opposing political affiliations and had knowledge of their political affiliations, Plaintiffs focused almost exclusively on the suspicious way they were treated by Defendants near the end of their probationary periods, and the allegedly spurious reasons supplied by Defendants for their failure to survive their respective probationary periods. Plaintiffs saw in this evidence a circumstantial case of political discrimination.

### 2.  Defendants' case

Aware of the Mt. Healthy line of cases, Defendants presented a case that also focused on the reasons for Plaintiffs' dismissal.  In their view, they were attempting to establish that

regardless of any political discrimination, Plaintiffs' dismissals would have occurred anyhow for non-discriminatory reasons. When they renewed their Rule 50(a) motion, Defendants stated that "[i]t is defendant's [sic] position that we have presented to the Honorable Court a strong Mt. Healthy defense." Defendants' counsel continued: "Defendants produced sufficient facts about plaintiffs [sic] failure to properly perform their duties, and will [sic] have rendered the same evaluations and will [sic] have taken the same termination decision for the reasons that are nondiscriminatory, in other words, Mt. Healthy defense."

## C. Vázquez-Valentín and the district court's decision

In concluding that Plaintiffs had not made the requisite showings to get to the jury on their political discrimination claims, the district court relied on our Vázquez-Valentín decision. In Vázquez-Valentín, the plaintiff attempted to challenge her demotion in the wake of a change in political administration by relying on some of the typical indicia of political discrimination. See generally 385 F.3d at 23. The defendants in that case "reassigned several hundred employees, including [the plaintiff]." Id. at 35. The plaintiff asserted that her reassignment to a lower position was based on improper political discrimination rather than the defendants' claim of a systematic reclassification of existing positions. Id. at 28-29. To demonstrate that the defendants had knowledge of her political affiliation, the plaintiff referred to

a single encounter during routine campaign canvassing, and testimony about her prior activities and positions under a previous administration. Id. at 37-38. As to political animus, the plaintiff offered two comments made by the defendants, id. at 36, 38. The plaintiff also presented evidence about her qualifications for the job at issue, and the gradual erosion of her responsibilities when the new administration took charge.

In concluding that Vázquez-Valentín presented insufficient evidence to get to the jury on her political discrimination claim, we specified the following deficiencies: (1) she had not presented evidence creating a reasonable inference that the defendants were even aware of her political affiliation when her personnel file was reviewed and she was reassigned to another position; (2) her evidence fell short of proving that she had been treated in a discriminatory manner because of undisputed testimony that she did not meet the statutory procedural requirements for her present position; (3) one of the statements she relied on -- the mayor's comment about "cleaning house" -- was not a direct statement about NPP employees; (4) her supervisor's statement of political animus was a stray comment that could not be attributed to the defendant city officials; (5) the actions of her supervisor in failing to provide her with adequate work for five months similarly could not be attributed to the defendants; and (6) importantly, the plaintiff offered no evidence that PDP members

-40-

were hired to replace the reassigned NPP members. <u>Vázquez-Valentín</u>, 385 F.3d at 37-40.

Apparently focusing on these deficiencies, the district court saw <u>Vázquez-Valentín</u> as a baseline for the amount of evidence a political discrimination plaintiff must present in order to reach the jury:

> If this case -- if the case of <u>Vázquez-Valentín</u> did not meet the standard of proof for jury submission . . . then this case, that we are trying now . . . doesn't meet it either. . . . The truth of the matter is that the case of <u>Vázquez</u> . . . contained a lot more evidence of potential discriminatory motives and of a circumstantial nature than the one that we are trying.

The district court's statement is a fair observation as far as it goes. As already noted, there is no evidence in this case of politically discriminatory remarks. There is no evidence of large scale demotions or firings of the members of one political party. But the court's focus on some of the more familiar indicia of political discrimination described in <u>Vázquez-Valentín</u> may have prevented the district court from recognizing that the evidence of political discrimination presented by Plaintiffs had produced a political discrimination case very different from <u>Vázquez-Valentín</u>.

## D.  **The sufficiency of the evidence**

A plaintiff must typically make four showings to prove a case of political discrimination: (1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's opposing political

-41-

affiliation; (3) there is a challenged employment action; and (4) "sufficient evidence, whether direct or circumstantial . . . that political affiliation was a substantial or motivating factor . . . that the challenged employment action stemmed from politically based animus." González-de-Blasini v. Family Dept., 377 F.3d 81, 85-86 (1st Cir. 2004) (internal citations and quotation marks omitted).

Plaintiffs testified, on direct examination, that they were all affiliated with the NPP. They presented enough circumstantial evidence of Santiago and Hernández's affiliation to permit a reasonable factfinder to conclude that Defendants were affiliated with the PDP. Plaintiffs proffered testimony that their political affiliations were well-known within the CDA itself, and Hernández, one of the Defendants, asked one of the Plaintiffs to identify her political affiliation. Also, Plaintiffs' evidence portrays a relatively small workplace where everyone knew who everyone else was and political affiliations were common office knowledge. Given this evidence, a reasonable jury could conclude that Defendants knew of Plaintiffs' political affiliations. There is no dispute that Plaintiffs were terminated from their career positions at the end of their probationary periods.

Therefore, not surprisingly, this appeal turns on the fourth showing required to prove political discrimination -- that political discrimination was a substantial or motivating factor in

the challenged employment action. Before evaluating the evidence on this issue for each Plaintiff, we must make some preliminary points applicable to each Plaintiff's case. We are reviewing a district court's decision to grant judgment as a matter of law. As a result, we must evaluate the evidence in the light most favorable to the non-moving party, here Plaintiffs, and we draw all reasonable inferences in their favor. See Figueroa-Torres, 232 F.3d at 273. We "may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial." Id. That is the province of the jury.

Moreover, in political discrimination cases where the defendants present evidence of the non-discriminatory reasons for the adverse employment decisions at issue, the falsity of those reasons can provide circumstantial evidence that political discrimination was a substantial or motivating factor in the adverse employment decision. This proposition is well-established in Title VII law. In Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000), the Supreme Court stated that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is quite probative of intentional discrimination, and it may be quite persuasive . . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is

-43-

dissembling to cover up a discriminatory purpose." Id. at 147 (internal quotation marks and citation omitted.); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 517 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"); McDonough v. City of Quincy, 452 F.3d 8, 17 (1st Cir. 2006)("Evidence that the defendant's reason was pretext may . . . ground a finding of liability."); Fite v Digital Equipment Corp., 232 F.3d 3, 7 (1st Cir. 2000). The evidentiary significance of a false explanation for an employment decision is based on a general proposition of evidence law. As the Supreme Court explained in Reeves: "[s]uch an inference [of falsity] is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" Reeves, 530 U.S. at 147 (emphasis added). This general proposition applies in this case. However, we are not suggesting that a jury's finding that Defendants gave false explanations for their adverse employment decisions would be sufficient alone to establish that political discrimination was a substantial or motivating factor in those employment decisions. We are simply saying that such a finding would be circumstantial evidence of such discrimination.

We may also consider the circumstances surrounding the adverse employment decisions affecting the Plaintiffs. Prior to

the change in administrations, all three Plaintiffs had uneventful probationary periods with only positive evaluations. Their final evaluations were the only negative marks on their records. These final evaluations were conducted over a brief period of time -- for as little as two weeks (Pérez) to four weeks (Gascot), at a time when Santiago and Hernández faced many other demands for their attention because of the transition in administrations. Although not required to do so, Santiago conceded that he did not take into account Plaintiffs' prior, positive evaluations in reaching his termination decisions. Plaintiffs were never admonished for their alleged performance deficiencies at the time of their occurrences, and they received their negative evaluations on the day of their respective terminations, in contravention of a regulation requiring that the termination and final evaluation "be given to the employee no less than 10 days before the date of separation."

Again, we are not suggesting that this evidence alone establishes that political discrimination was a substantial or motivating factor in the adverse employment decision of Defendants. Still, the three employees who described these strikingly similar stories were members of the same political party, now out of power. See, e.g., Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 80 (1st Cir. 2006) ("It is suspicious that both of [the NPP plaintiffs] were demoted without being given any notice or opportunity to defend their promotions, especially since the initial explanation

offered for the demotions was simply missing documentation. . . . Further, these missing documents mysteriously reappeared after [the plaintiffs] presented their copies of the missing documents. . . . Even after the missing documents were replaced, [the plaintiffs] were not reinstated; rather, other justifications were given for their demotions.").

Importantly, Defendants presented no evidence that they were conducting final evaluations of all probationary employees in the CDA. They presented no evidence that these three employees were the only probationary employees in the department. They presented no evidence that they were engaged in a systematic review of the personnel files of all employees in search of hiring or promotion irregularities. Under the circumstances, a jury could conclude that the common denominator that explains the strikingly similar stories of Plaintiffs was their shared political affiliation.

Without repeating the summaries of the evidence already presented, we turn now to a closer examination of the evidence presented by each Plaintiff, with a particular focus on the points of conflict in the testimony of the parties.

### 1. Pérez

In her testimony, Pérez described her job duties and responsibilities, said that she performed them well, and noted that all of her prior evaluations during the probationary period were

positive. Pérez used a computer in compiling the wage and vacation information for which she was responsible. She said a computer was "indispensable . . . to do it efficiently". Hernández painted a different picture of Pérez's performance, stating that she performed her duties deficiently, committed computational errors, insisted unnecessarily on the use of a computer, and was insubordinate when told to cease using a particular computer.

Pérez challenged Hernández's account in several ways. On cross-examination, Hernández acknowledged that she disregarded a regulation requiring that a probationary employee receive the last evaluation ten days before the date of separation.[8] Pérez received her last evaluation on the day of her separation. Hernández admitted that by not following the applicable regulation prescribing when evaluations are given to an employee, she increased the number of days she had to conduct Pérez's final

---

[8] From the trial transcript, we discern that this regulation, which Hernández described as "the regulations of essential areas and merits, and it establishes the probationary period," was entered as Defendant's Exhibit Number 10. Paragraph number five stated that:

> Any employee can be separated from the position during or at the end of the probationary period after being duly oriented and trained, if it is determined that his progress adaptability to the guidelines in the public service has not been satisfactory.

> The separation must be done through an official communication signed by the secretary, accompanied by the last evaluation. Said communication should be given to the employee no less than 10 days before the date of separation.

evaluation from two days to twelve days. With respect to the computational errors attributed to Pérez, Hernández admitted, on questioning by the district court, that other employees could have been responsible for Pérez's errors. On cross-examination, Hernández also acknowledged that she exaggerated the severity of the consequences of any errors Pérez might have committed in her wage calculations. Finally, Hernández admitted that she included in her final evaluation alleged errors that would have been accounted for in the November 16 to December 31 evaluation, thereby inappropriately considering job performance outside of the final evaluation period. (Additionally, these prior evaluations were positive in spite of those errors.)

In light of these challenges to Hernández's account of Pérez's performance deficiencies, and the responsibility of the jury for assessing the credibility of witnesses, we conclude that a reasonable jury could choose to believe Pérez's account of her performance and reject Hernández's account.[9]

---

[9] There is essentially no credibility contest between Pérez and Santiago. Pérez offered virtually no testimony implicating Santiago in her adverse employment action. Her only particularized evidence consists of Santiago's testimony that he relied on Hernández's evaluation of Pérez and approved Hernández's decision to dismiss her. Santiago essentially "rubber-stamped" Hernández's termination of Pérez. This is not enough evidence to permit a reasonable jury to conclude that political discrimination was a substantial or motivating factor in Santiago's decision to terminate Pérez. We must affirm the court's dismissal of Pérez's claim against Santiago.

## 2. Negrón

Much like Pérez, Negrón testified about her job duties and her satisfactory performance of those duties. Also like Pérez, Negrón discovered the specific objections to her work at the end of the final day of her probationary period, a violation of the ten-day notice required by the regulation prescribing procedures for probationary periods described above. Negrón also described a number of specific tasks she was asked to perform for Santiago on his arrival as CDA Administrator. The three tasks at issue were: the installation of a new door lock for Santiago's office; the moving of certain furniture and file cabinets; and the repair of an air conditioning duct in Santiago's office. Because of the content of her final probationary evaluation, Negrón anticipated Santiago's negative account of her performance of these tasks and provided explanations in her direct testimony for the way she performed them. These explanations for her performance were never given directly to Santiago or anyone else at the agency because she was never given the opportunity to do so.

Santiago testified to a starkly different version of Negrón's performance of these tasks. On cross-examination, Plaintiffs' counsel challenged the basis for Santiago's objections. As to the moving of the furniture and file cabinets, Negrón had explained that the furniture and file cabinets were moved as fast as possible, and that the delay was caused by the lack of personnel

to move the objects. Santiago conceded that Negrón had to wait for additional personnel because she could not have moved the objects on her own. As to the installation of the lock on Santiago's office door, Negrón maintained in her direct testimony that the technician installed the lock improperly despite the specific instructions that she provided. When she was notified of this error, she promptly had the lock reinstalled properly. On cross-examination, Santiago was asked whether Negrón ordered the technician to install the lock backwards. He admitted, "I didn't say that she did it." Instead, he complained that she should have checked the installation when the work was completed. But he also conceded that installing a lock is "not that complex" and that it was not necessary for her to observe the entire installation. As to the repair of the office's air conditioning, Santiago acknowledged that the only reason the air conditioning was not fixed was because he refused to provide the written authorization requested by Negrón. When Plaintiffs' counsel asked Santiago the reason for his refusal, Santiago said that Negrón's paperwork was "redundant" and it would set a bad precedent. He never said the request was improper or against CDA policy.

Based on Negrón's points of contention with Santiago's account of her job performance, including the violation of the ten day requirement, we conclude that a reasonable jury could choose to

believe Negrón's account of her work and reject Santiago's account as a false explanation.

### 3. Gascot

Like her fellow Plaintiffs, Gascot described a relatively uneventful probationary period. She detailed her duties as head of the managerial/entrepreneurial school and recounted her satisfactory performance of those duties, as evidenced by her prior positive evaluations. Like Negrón, based on the contents of her final negative evaluation, Gascot anticipated the objections that Santiago had with the performance of her duties. In his evaluation, Santiago stated as reasons for Gascot's dismissal: "Improper utilization of funds and resources available in the offering of courses, careless in the effective mantenance of the vehicle in the school." Later, in response to an interrogatory requesting all of the reasons for Gascot's dismissal, Santiago mentioned only a single reason: her mismanagement of a CDA vehicle. In his deposition testimony, he elaborated to some degree on his dissatisfaction with Gascot's job performance. He referred to Gascot's mishandling of the CDA vehicle; he said that the school's "courses were ineffective"; and he said that Gascot "did not have an organized working plan for the school." On direct examination at trial, Santiago significantly expanded on the deficiencies in Gascot's performance, listing a number of other "plans" that Gascot had failed to produce, including a "capacitation plan," a "study of

needs," and a "promotional advertising plan." On cross-examination, Santiago admitted that his answer to the interrogatory had not included many of the problems with Gascot's performance that he was now describing.

Curiously, when Defendants' counsel cross-examined Gascot, he permitted her to testify that she had prepared a training and service plan for the school and had submitted it as part of transition procedures to Santiago. Moreover, Gascot stated in response to that same cross-examination that Santiago "had no criteria for rendering" his negative evaluation because "[h]e did not meet with me and ask for the plan. He did not ask me for the study or the research of needs. He didn't . . . [say] let's see where are the studies. If he had asked me I would have given them all to him and would have avoided all of this."

On cross-examination, Santiago admitted to receiving a transition report, introduced into evidence by Plaintiff's counsel, which included a document that Santiago identified as a "working plan" for the school, though he claimed to have never seen that working plan before. This exchange suggested that Santiago criticized Gascot for her failure to plan, yet he had received a document from her reflecting such planning. Additionally, Santiago conceded that while he criticized Gascot for not updating the entrepreneurial school's curriculum, that curriculum had remained unchanged at the time of Santiago's departure from the CDA one year

later, well after Gascot's departure. Also, he acknowledged that the contents of the transition report he received called into question Santiago's claim that the disrepair of the CDA vehicle was caused by Gascot's neglect because the vehicle was already old when Gascot assumed her responsibilities.

Because of these challenges to Santiago's account of Gascot's performance, we conclude that a reasonable jury could choose to believe Gascot's account of her performance and reject Santiago's account as a false explanation.

### 4. Summary

In essence, Plaintiffs described satisfactory job performances throughout their probationary periods until the new administration arrived with a different political affiliation. Then they received negative evaluations based on a limited period of observation. Those negative evaluations were presented to them on the last day of their probationary periods when they were terminated from their positions, in violation of a regulation requiring that such evaluations be presented to the probationary employees ten days before separation. In their testimony, Defendants explained the deficiencies in the job performance of Plaintiffs justifying these adverse employment decisions. In both their direct testimony, which anticipated some of the explanations by Defendants, and in cross-examination of Defendants, Plaintiffs challenged the authenticity of these accounts. In the presence of

this conflicting testimony, a reasonable jury could believe Plaintiffs and disbelieve Defendants. As we have already explained, the fact that a jury could find that Defendants gave false explanations has evidentiary significance. See Reeves, 530 U.S. at 147 (stating that "the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt'").

However, Plaintiffs cannot establish their case of political discrimination solely by persuading a jury that Defendants' explanations were false. Plaintiffs have the burden of establishing specifically that political discrimination was a substantial or motivating factor for the adverse employment action. See Acevedo-Diaz, 1 F.3d at 66. On this issue, there was other relevant evidence that a jury could consider to supplement a jury finding of false explanations for the adverse employment decisions.

These three dismissals all happened within one month of a change in political administrations. The temporal proximity between a change in political administrations and an adverse employment action is relevant to the issue of whether political affiliation was a substantial or motivating factor in the adverse employment decision. See Acevedo-Diaz, 1 F.3d at 69 ("Mere temporal proximity between a change of administration and a public employee's dismissal is insufficient to establish discriminatory animus" (emphasis added).). Moreover, a jury could conclude that

it was more than coincidence that the three probationary employees who lost their jobs were members of the same political party now out of power. For unexplained reasons, these three employees became the focus of hurried evaluations that, in some important respects, did not conform to the regulations for such evaluations of probationary employees. These hurried evaluations gave the appearance of a coordinated effort to rid the agency of three employees who shared a different political affiliation than the party now in power.

Under these circumstances, a reasonable fact finder could conclude that Plaintiffs have established that political discrimination was a substantial or motivating factor in the loss of their jobs. Therefore, it was an error of law for the court to grant Defendants' second Rule 50(a) motion and keep from the jury Pérez's claim against Hernández, and the claims of Negrón and Gascot against Santiago.

In summary, we **<u>affirm</u>** the district court's dismissal of Pérez's claim against Santiago. We **<u>vacate</u>** its dismissal of Pérez's claim against Hernández, and the claims of Negrón and Gascot against Santiago. Each party is to bear its own costs.

**<u>So ordered</u>**.